MSG

PAE AO 241
(Rev. 07/10)

Page 4

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Eastern District of Pennsylvania |
|---|---|
| Name (under which you were convicted): Montez Bethea | Docket or Case No.: 20 1389 |
| Place of Confinement: SCI Houtzdale | Prisoner No.: EB2665 |
| Petitioner (Include the name under which you were convicted): Bethea | Respondent (Name of Warden, Superintendent, Jailor, or authorized person having custody of petitioner): Barry Smith |

v.

and

The District Attorney of the County of: Phil.

and

The Attorney General of the State of: PA

## PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging.

   CCP Phil

   (b) Criminal docket or case number (if you know) CP-51-CR-0009460-2011
   CP-51-CR-0009461-2011

2. (a) Date of judgment of conviction (if you know): 9/11/13

   (b) Date of sentencing:

3. Length of sentence 2 Consecutive life terms

4. In this case, were you convicted on more than one count or of more than one crime? ☑ Yes  ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case. 2 ct 1st degree murder, Consp., robbery, VUFA, PICC, PWID

PAE AO 241
(Rev  07 10)

Page 5

6       (a)     What was your plea?  (Check one)

☑ (1)    Not Guilty                    ☐ (3)    Nolo contendere (no contest)

☐ (2)    Guilty                        ☐ (4)    Insanity plea

        (b)     If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge,
                what did you plead guilty to and what did you plead not guilty to?

        (c)     If you went to trial, what kind of trial did you have?  (Check one)

                ☑        Jury                      ☐        Judge only

7       Did you testify at a pretrial hearing, trial, or a post-trial hearing?

                ☐        Yes                       ☑        No

8.      Did you appeal from the judgment of conviction?

                ☑        Yes                       ☐        No

9.      If you did appeal, answer the following:
        (a)     Name of court:  _Superior Ct_
        (b)     Docket or case number (if you know).  _2967  EDA 2013_
        (c)     Result.  _lower ct affirmd_
        (d)     Date of result (if you know)  _12/23/14_
        (e)     Citation to the case (if you know):  ___
        (f)     Grounds raised:
                _weight + sufficiency of evid_

PAE AO 241
(Rev 07 10)

Page 6

(g) Did you seek further review by a higher state court?   ☑ Yes   ☐ No

If yes, answer the following·

(1) Name of court   _P A   Supreme_

(2) Docket or case number (if you know) _____

(3) Result.   _affirmed_

(4) Date of result (if you know).   _6/25/15_

(5) Citation to the case (if you know).

(6) Grounds raised:

_weight + sufficiency of evid_

(h) Did you file a petition for certiorari in the United States Supreme Court?   ☐ Yes   ☑ No

If yes, answer the following·

(1) Docket or case number (if you know).

(2) Result:

(3) Date of result (if you know)·

(4) Citation to the case (if you know):

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?   ☑ Yes   ☐ No

11. If your answer to Question 10 was "Yes," give the following information.

(a) (1) Name of court:   _C C P_

(2) Docket or case number (if you know)·   _same as above C P #_

(3) Date of filing (if you know)·   _4/16/16_

(4) Nature of the proceeding:   _PCRA_

(5) Grounds raised   _see attached_

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☑ Yes          ☐ No

(7) Result.  *affirmed*

(8) Date of result (if you know) ___ 10/19/18 ___

(b)  If you filed any second petition, application, or motion, give the same information

(1) Name of court: _

(2) Docket or case number (if you know)· _

(3) Date of filing (if you know)·          *NA*

(4) Nature of the proceeding:

(5) Grounds raised·

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes          ☐ No

(7) Result: _          *NA*

(8) Date of result (if you know). ____

(c)  If you filed any third petition, application, or motion, give the same information·

(1) Name of court: ___

(2) Docket or case number (if you know).

(3) Date of filing (if you know): _          *NA*

(4) Nature of the proceeding:

(5) Grounds raised: _

PAE AO 241
(Rev 07/10)

Page 8

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

        ☐   Yes        ☐  No

(7) Result ___ .

(8) Date of result (if you know)

(d)   Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion:

(1)   First petition.      ☑   Yes      ☐  No

(2)   Second petition·   ☐   Yes      ☐  No  N/A

(3)   Third petition.    ☐   Yes      ☐  No

(e)   If you did not appeal to the highest state court having jurisdiction, explain why you did not:

12    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States   Attach additional pages if you have more than four grounds.  State the facts supporting each ground.

**CAUTION:** To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court  Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date

**GROUND ONE:** _ I AC

(a) Supporting facts (Do not argue or cite law  Just state the specific facts that support your claim.)

    Counsel ineffectively adused defendant not to testify

PAE AO 241
(Rev 07 10)                                                                                    Page 9

(b) If you did not exhaust your state remedies on Ground One, explain why

(c) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

☐ Yes          ☑ No

(2) If you did not raise this issue in your direct appeal, explain why?  $IAC$ $claim$

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes          ☐ No

(2) If your answer to Question (d)(1) is "Yes," state.

Type of motion or petition:  $PCRA$

Name and location of the court where the motion or petition was filed:  $CCP$ $Phl$

Docket or case number (if you know):  $Same$ $CP$ $\#$

Date of the court's decision.  $4/16/16$

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?          ☑ Yes          ☐ No

(4) Did you appeal from the denial of your motion or petition?          ☑ Yes          ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☑ Yes          ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed  $Superior$ $Ct$

Docket or case number (if you know):  $3375$ $EDA$ $2018$

Date of the court's decision:

PAE AO 241
(Rev 07 10)

Page 10

Result (attach a copy of the court's opinion or order, if available)·

*affirmed*

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue·

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc ) that you have used to exhaust your state remedies on Ground One

**GROUND TWO:**  *See a Hache)*
    *After discovered eud*

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground Two, explain why. _____ _____

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

☐    Yes            ☑    No

PAE AO 241
(Rev 07/10)

(2) If you did not raise this issue in your direct appeal, explain why?

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes          ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition ___ *PCRA* ___

Name and location of the court where the motion or petition was filed ___ *CCP Phil* ___

Docket or case number (if you know)·

Date of the court's decision: *10/19/18*

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?          ☑ Yes          ☐ No

(4) Did you appeal from the denial of your motion or petition?          ☑ Yes          ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☑ Yes          ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed *Superior Ct*

Docket or case number (if you know) *3375 EDA 2018*

Date of the court's decision.

Result (attach a copy of the court's opinion or order, if available)· *affirmd*

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue

PAE \(\) 241
(Rev. 07 10)

Page 12

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two

GROUND THREE: See attached. IAC

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim):

Counsel failed to secure + use phone records

(b) If you did not exhaust your state remedies on Ground Three, explain why:

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

☐ Yes          ☑ No

(2) If you did not raise this issue in your direct appeal, explain why?   IAC claim

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes          ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition   PCRA

PAE AO 241
(Rev  07-10)                                                                    Page 13

Name and location of the court where the motion or petition was filed

_____ CCP  Phil _____

Docket or case number (if you know) __ same  dorket #__

Date of the court's decision. __ _  ___  __ _ __

Result (attach a copy of the court's opinion or order, if available)

affirmd _____ ___

(3) Did you receive a hearing on your motion or petition?          ☐  Yes      ☑  No

(4) Did you appeal from the denial of your motion or petition?    ☑  Yes      ☐  No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?
                    ☑  Yes        ☐  No

(6) If your answer to Question (d)(4) is "Yes," state.

Name and location of the court where the appeal was filed __ Superior Ct_____

Docket or case number (if you know) __ 3375  EDA 2018 _____

Date of the court's decision· _  _  ___ _ _ __ ·· __

Result (attach a copy of the court's opinion or order, if available)· __  _  __  _____

(7) If your answer to Question (d)(4) or Question (d)(5) is  "No," explain why you did not raise
this issue:

(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,
         etc.)  that you have used to exhaust your state remedies on Ground Three _____  _  _

**GROUND FOUR:**   IAC

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim ):

_Counsel failed to obtain & use impeachment
evi

PAE AO 241
(Rev 07/10)

(b) If you did not exhaust your state remedies on Ground Four, explain why.

**(c) Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

☐ Yes          ☑ No

(2) If you did not raise this issue in your direct appeal, explain why? ___IAC claim___

**(d) Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes          ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition ___PCRA___

Name and location of the court where the motion or petition was filed: ___CCP Phil___

Docket or case number (if you know). ___Same docket #___

Date of the court's decision _____

Result (attach a copy of the court's opinion or order, if available): _____

(3) Did you receive a hearing on your motion or petition? ☐ Yes   ☑ No

(4) Did you appeal from the denial of your motion or petition? ☑ Yes   ☐ No

PAE AO 241
(Rev  07 10)

Page 15

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☑ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:  Superior Ct

Docket or case number (if you know): 3375 EDA 2015

Date of the court's decision.

Result (attach a copy of the court's opinion or order, if available)
affirmed

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue

See attached for additional Claims raised PCRA 13

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:

Please answer these additional questions about the petition you are filing.

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? ☑ Yes ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them.

PAE AO 241
(Rev  07/10)                                                                                                      Page 16

(b)  Is there any ground in this petition that has not been presented in some state or federal court?  If
     so, which ground or grounds have not been presented, and state your reasons for not presenting
     them:

14.  Have you previously filed any type of petition, application, or motion in a federal court regarding the
     conviction that you challenge in this petition?         ☐  Yes          ☑  No

     If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the
     issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.
     Attach a copy of any court opinion or order, if available

15   Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or
     federal, for the judgment you are challenging?          ☐  Yes          ☑  No

     If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and
     the issues raised.

16   Give the name and address, if you know, of each attorney who represented you in the following stages of
     the judgment you are challenging:
     (a)  At preliminary hearing:

     (b)  At arraignment and plea.

PAE AO 241
(Rev 07-10)

Page 1

(c)  At trial.  David Scott Rudenstein

(d)  At sentencing  David Scott Rudenstein

(e)  On appeal

(f)  In any post-conviction proceeding  Ten B. Himebaugh

(g)  On appeal from any ruling against you in a post-conviction proceeding:
Ten B Himebaugh

17  Do you have any future sentence to serve after you complete the sentence for the judgment that you are
challenging?  ☐ Yes  ☒ No

(a)  If so, give the name and location of the court that imposed the other sentence you will serve in the
future:

(b)  Give the date the other sentence was imposed _____

(c)  Give the length of the other sentence:

(d)  Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be
served in the future?  ☐ Yes  ☒ No

18  **TIMELINESS OF PETITION:** If your judgment of conviction became final over one year ago, you must
explain why the one-year statute of limitations as contained in 28 U.S C § 2244(d) does not bar your
petition

Filed
w/in 365 days minus periods
of tolling

PAE AO 241
(Rev  07 10)

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U S C  § 2244(d) provides in part that·

(1)     A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State Court   The limitation period shall run from the latest of -

    (A)     the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B)     the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

    (C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief.  *Vacating of his Conviction*

or any other relief to which petitioner may be entitled.

*Teru B Hemeby*
Signature of Attorney (if any)

PAE AO 241
(Rev  07 10)

Page 19

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on   **3/10/20**

(month, date, year)

Executed (signed) on _____ _____ _____ (date)

*Teri B. Henebach*

Signature of Petitioner

*For Montez Bethea*

If the person signing is not the petitioner, state the relationship to petitioner and explain why petitioner is not signing this petition.   *attorney / client*

I.    Petitioner was denied his rights under the Sixth
      Amendment of the U.S. Constitution and Article 1,
      sec. 9 of the Pennsylvania Constitution when
      trial counsel ineffectively advised Petitioner
      not to testify on his own behalf.

**II.**   After discovered evidence that the Commonwealth's
      key witness, Darryl Rigney, lied when he
      inculpated the Petitioner in the crime.

III   Petitioner was denied his Sixth Amendment and Article
      1, sec. 9 rights when trial counsel ineffectively
      failed to secure and use these phone records at trial.

IV.   Petitioner was denied his rights under the Sixth
      Amendment of the U.S. Constitution and
      Article 1, sec.9 of the Pennsylvania Constitution
      when counsel ineffectively failed to obtain and
      use available impeachment evidence.

V.    Petitioner was denied his rights under the Sixth
      Amendment of the U.S. Constitution and Article 1,
      sec.9 of the Pennsylvania Constitution when counsel
      ineffectively failed to object to the trial court
      using hearsay evidence obtained as part of the Motion
      to Suppress for the truth of the matter asserted at
      trial; to the extent that this Court finds that the
      claim was preserved at trial for appeal, Petitioner's
      appellate counsel was ineffective for failing to
      present and argue it in the direct appeal.

VI.   Petitioner was denied his rights under the Fourth
      and Sixth Amendments of the U.S. Constitution and
      Article 1, sec.9 of the Pennsylvania Constitution when
      counsel ineffectively failed to preserve, raise and
      argue a claim on direct appeal that the trial court
      erred in denying the Motion to Suppress.

VII.  Petitioner's constitutional right to due process
      And a fair trial were violated in that there was
      insufficient evidence to convict the Petitioner of all
      charges.

Teri B. Himebaugh, Esq.
1409 Spring Garden #911
Philadelphia, PA 19130
PA ID 93603
(484) 686 3279
tt_mebaughesq@earthlink.ne

## IN THE U.S. DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

Montez Bethea                    )
                                 )
                                 )
                                 )
        V                        )
                                 )   NO:
                                 )
                                 )
Barry Smith, Superintendent SCI  )
                                 )
Houtzdale et. al                 )

## HABEAS CORPUS PETITION

The Petitioner, Montez Bethea, by and through counsel, Teri
B. Himebaugh, Esq., hereby files the instant Habeas Corpus
Petition and alleges the following:

### PROCEDURAL POSTURE

Petitioner was tried with his co-defendant, Rashann James,
in a waiver trial before the Honorable Glenn Bronson of the
Court of Common Pleas for Philadelphia County. Petitioner was
represented by David Scott Rudenstein, Esquire.

On September 11, 2013 Petitioner was found guilty of two
counts of Murder in the First Degree, criminal conspiracy,

first-degree robbery and one count of carrying a fireman without a license, carrying a firearm on public streets, possession with intent to deliver a controlled substance and possessing an instrument of crime. He was sentenced to two consecutive terms of life-imprisonment.

The Superior Court affirmed the trial court on December 23, 2014. *Commonwealth v. Bethea* 2967 EDA 2013 (Pa. Super.Ct. 2014). A timely Petition for Allowance of Appeal was filed and then denied on June 25, 2015.

On April 16, 2016 Petitioner filed a timely *pro se* PCRA petition. Teri B. Himebaugh, Esquire entered her appearance and filed a Motion for Leave to Amend which was granted by the Court.

On April 27, 2018 and July 20, 2018 the PCRA Court held a hearing on Claims I, II and III. On October 19, 2018 the PCRA Court dismissed the petition.

Petitioner filed a timely Notice of Appeal to the Superior Court from that decision. (3148 EDA 2018). On December 20, 2019 the Superior Court affirmed the PCRA Court.

The instant habeas petition is Petitioner's first and is timely filed within 365 days of the day that his judgement of sentence became final, minus periods of tolling while exhausting the claims in state court.

**FACTUAL SUMMARY**

The Commonwealth alleged that on December 8, 2010, at approximately 11 am., Petitioner called Darryl Rigney and asked him to accompany him to buy marijuana. (N.T. 9/10/13 pg. 115-116). Petitioner drove to Rigney's house in a Crown Victoria. (N.T. 9/10/13 pg. 116).

According to Rigney's trial testimony, Petitioner asked him to drive them to Rashann James' house, because James knew people who sold marijuana. (N.T. 9/10/13 pg. 116, 120). When they arrived at James' house, Rigney stayed in the car while the Petitioner and James got out and went to the front door. When James answered, Petitioner went inside. (N.T. 9/10/13 pg. 116-117).

Petitioner and James exited and got inside the Crown Victoria where Rigney was waiting. (N.T. 9/10/13 pg. 117). James called his drug supplier, Jemark Daniel, who did not answer. (N.T. 9/10/13 pgs. 117-120). James then called 'a friend' and told him to meet James at 17th Street and Fairmount Avenue. (N.T. 9/10/13 pg. 117-119).[1]

---

[1] In both the Trial and PCRA Opinions, the Court identified this 'friend' as Robert Williams despite the fact that no witness had identified this person as being Robert Williams during the trial. (1/28/19 Opinion, pg. 4; 12/6/13 Opinion pg. 2-3; N.T. 9/10/13 pg. 117-119). At the PCRA hearing the Commonwealth introduced Williams statement to police to refute Rigney's testimony. However, it must be noted that this was not admitted at the trial and therefore was not 'of record' for purposes of

Daniel called James back and told him that they could come by Daniel's apartment to buy marijuana. (N.T. 9/10/13 pg. 119).

Rigney then drove the three men to 17th Street and Fairmount Avenue, where James' friend was waiting near a white Cadillac. (N.T. 9/10/13 pg. 120). Petitioner, James and Rigney got into the white Cadillac, while his friend took the Crown Victoria. (N.T. 9/10/13 pg. 120).

Rigney drove the white Cadillac to 3001 Redner Street, where Daniel lived. (N.T. 9/10/13 pg. 120). Petitioner and James got out of the car and went into Daniel's apartment. (N.T. 9/10/13 pg. 121-122). Upon entering the apartment, James and Petitioner shot and killed Daniel and his girlfriend, Patranella London, and stole his marijuana and passports from the apartment.

Petitioner and James left the apartment and ran back to the Cadillac with a large black garbage bag. (N.T. 9/10/13 pg. 122, 126). As Rigney drove the car away from the apartment building, James asked Petitioner if the woman was "finished" and the Petitioner allegedly responded "guaranteed" (N.T. 9/10/13 pg. 126). James said "I took his shit." (N.T. 9/10/13 pg. 160).

_____ _ ___ _ _ _____ _____ __ ___ ____ _____ ___ _ _____ _ __

the 12/6/13 Trial Court opinion or the PCRA Court findings of fact. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011). The Trial/PCRA Court cannot rely substantively on the statement. To do so violates Petitioner's Sixth Amendment rights under the Confrontation Clause. *Melendez-Diaz v. Massachusetts*, 129 S.Ct.

Daniel's neighbor, Lester Johnson, heard the gunshots and looked out his window. Johnson saw the white Cadillac speed away from Daniel's apartment. (N.T. 9/10/13 pg. 10). Johnson wrote down what he could see of the license plate number, which was "HP 7-27." A friend who was with Johnson called 911. (N.T. 9/10/13 pgs. 11-14).

At the same time that police were arriving at the crime scene, Officer Charles Kapusniak and his partner, Officer Kenneth Long, were conducting an unrelated surveillance on the 1800 block of North Judson Street. (N.T. 9/9/13 pg. 94; 9/10/13 pg. 12, 40, 89). At approximately 2:40 pm., Officer Kapusniak observed a white Cadillac travel southbound on Judson Street before pulling over near 1820 North Judson Street. (N.T. 9/9/13 pg. 95).

Officer Kapusniak saw Rigney exit the vehicle's driver door. James emerged from the front passenger seat and Petitioner got out of the rear passenger seat. (N.T. 9/9/13 pg. 95-96). All three men then walked to the rear of the Cadillac, and James removed a large trash bag from the Cadillac trunk. (N.T. 9/9/13 pg. 96-97, 108,122; 151-152).

The three men then ran into 1820 North Judson Street where Shonte Smith was babysitting. (N.T. 9/9/13 pg. 33, 96).

2527 (2009); *Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012).

Thirty seconds after the three men ran into the house on North Judson Street, Officer Kapusniak received a call over police radio from Lieutenant Smith. (N.T. 9/9/13 pg. 96, 123). Lieutenant Smith informed Officer Kapusniak of the shooting at Redner Street and that a white Cadillac containing two or three black males had been seen fleeing the scene. (N.T. 9/9/13 pg. 96, 123-125; 9/10/13 pg. 16-17).

Approximately one minute later Officer Kapusniak observed two men he later identified as Reginald Andrews and Maurice Morris walk past his vehicle. (N.T. 9/9/13 pg. 97-98). Andrews and Morris approached 1820 North Judson Street, knocked on the door and entered the house. James then stuck his head out of the door and looked around. (N.T. 9/9/13 pg. 98).

A short time later a silver Kia sped down the block and parked in the middle of the street in front of the house. (N.T. 9/9/13 pg. 98-99). James ran out of the house, carrying a black duffel bag and got into the car. (N.T. 9/9/13 pg. 99). The driver of the Kia, Mohammed Bey, drove down the street out of sight. (N.T. 9/9/13 pgs. 99-100,120-121).

Officer McCabe and Officer Miles, who were backing up Officer Kapusniak, then pulled over the Kia.(N.T. 9/9/13 pg. 99-100, 163- 165). James and Bey were detained along with the black duffel bag.

A few minutes later Andrews came out of Judson Street carrying a white shopping bag. When officers approached, he ran, throwing the bag over a fence. Inside the bag was a black backpack which contained passports and a photo album belonging to one of the victims of the Redner Street shooting along with marijuana and a green trash bag. (N.T. 9/9/13 pg. 192).

The decision was made by police to enter the Judson Street house. Smith testified that the police did not knock and they did not ask permission to come into the house. She didn't sign any consent form. They didn't show a search warrant. (N.T. 9/9/13 pg. 64-65,139).

Officer Kapusniak testified that, after police entered the Judson Street house, Petitioner and Rigney were sitting in the living room. Petitioner had a baby in his arms. There was an unzipped duffel bag containing clear Ziploc bags full of marijuana nearby. The marijuana recovered from the duffel bag matched the specific type of marijuana found at the scene of the murders. (N.T. 9/10/13 pg. 56).(N.T. 9/9/13 pg. 103-104, 136-137, 148).

Shonte Smith testified that while the police awaited the search warrant, she, Petitioner and Rigney were all placed in handcuffs in the living room. (N.T. 9/9/13 pg. 104). The police thereupon immediately conducted a complete sweep search of the whole house. (N.T. 9/9/13 pg. 104-105).

Officer Kapusniak testified that police had recovered the key to the white Cadillac from Rigney. (N.T. 9/9/13 pg.152).

Shonte Smith testified that she saw Petitioner kick a pink bag underneath the couch. (N.T. 9/10/13 pg. 41-44). Counsel stipulated that Officer Ken Weitran would have testified if called that this pink bag also contained weapons which matched to the ballistics found at the crime scene and recovered from the body of one of the victims. (N.T. 9/10/13 pg. 66-71).

## STANDARD OF REVIEW

To obtain habeas corpus relief, the Petitioner may allege that his confinement is the result of a violation of the United States Constitution. The Constitutional error must have had a substantial and injurious influence on the determination of guilt made by the jury. *Brecht v. Abraham*, 113. S.Ct. 1710 (1993); *Kotteakos v. U.S.,* 328 U.S. 750, 756 (1946).

Petitioner may also allege claims based on violations of State law if they resulted in fundamental unfairness, which consequently violated Petitioner's Fourteenth Amendment right to Due Process.

Under the AEDPA, habeas relief will not be granted for any claim adjudicated on the merits in State court unless the decision was contrary to, or involved an unreasonable application of "federal law clearly established by the Supreme Court", or "based upon an unreasonable determination of the facts." 28 U.S.C. §2254(d)(2).

A federal habeas court may issue the writ under the
'contrary to' clause if the state court applies a rule different
from the governing law set forth in the U.S. Supreme Court
cases, or if it decides a case differently than the Court has on
a set of materially indistinguishable facts.

Relief may be granted under the "unreasonable application"
clause "if the state court correctly identifies the governing
legal principle from the Supreme Court's decisions but
unreasonably applies it to the facts of the particular case."
*Bell v. Cone*, 535 U.S. 685, 694 (2002).

Generally, state courts' factual findings are presumed
correct unless the Petitioner can show by clear and convincing
evidence that the findings were erroneous. The general
presumption of correctness related to the State courts' factual
findings do not however apply to questions of law or mixed
questions of law and fact. *Cunningham v. Diesslin*, 92 F.3d 1054
(1996); *Wellman v. Maine* 962 F.2d 70 (1992); *Levasseur v. Pepe*
70 F.3d 187, 193.

**CLAIMS**

   I.     **Petitioner was denied his rights under the Sixth
          Amendment of the U.S. Constitution and Article 1,
          sec. 9 of the Pennsylvania Constitution when
          trial counsel ineffectively advised Petitioner
          not to testify on his own behalf.**

A defendant's decision to waive his constitutional right to testify is a fundamental decisions that must be made by the defendant and not counsel. *Commonwealth v. Uderra*, 550 Pa. 389, 706 A.2d 334 (1998); *Commonwealth v. Bazabe*, 404 Pa.Super. 408, 590 A.2d 1298, alloc. denied, 528 Pa. 635, 598 A.2d 992 (1991); *Commonwealth v. Fowler*, 362 Pa.Super. 81, 523 A.2d 784, alloc. denied, 517 Pa. 598, 535 A.2d 1056 (1987). However, in order to make that decision *intelligent*, the defendant must first receive meaningful assistance of counsel. (*Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1435 (3rd Cir. 1996).

A defendant's decision whether or not to waive his constitutional right to testify on his own behalf requires knowledge, not just of the fact of the case, but also an understanding of the rules of evidence, criminal procedure and criminal law. This is the type of knowledge that only counsel has by virtue of his education, training and experience.

The determination of whether a defendant's waiver was intelligent is based on the adequacy of counsel's advice to his client. *Moldonado v Winans*, 728 F.2d 438, 439 (10th Cir. 1984); *Scott v. Wainwright*, 698 F.2d 427, 429 (11th Cir. 1983). Counsel must have a reasonable, rational evidentiary basis for his advice that the Petitioner not to testify. *Roe v Flores-Ortega*, 528 U.S. 470, 120 S.Ct. 1029 (2000); *Commonwealth v. James Jones*, 651 A.2d 1101, 1109 (PA 1994).

Counsel's advice that the defendant not testify must be based on "objectively reasonable professional judgment" and within the "prevailing norms of practice for attorneys in criminal cases." *Strickland v. Washington*, 466 U.S. 668 (1984); *Commonwealth v Basemore*, 744 A.2d 717 (Pa. 2000); *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987); *McMann v. Richardson*, 397 U.S. 759 (1970); *Tollett v. Henderson*, 411 U.S. 258 (1973); *Wiggins v. Smith* 539 U.S. 510, 123 S.Ct. 2527 (2003). It must also be based on accurate and complete information. *Commonwealth v. Nieves*, 746 A.2d 1102 (Pa. 2000); *U.S. v Narducci,* 18 F.Supp. 2D 481.

Petitioner averred that counsel's advice was not objectively reasonable based upon the facts and evidence. *Strickland*, supra. The State Court ruling finding counsel effective was an unreasonable application of the law to the facts of Petitioner's case. While the state court identified the correct governing legal principle from the Supreme Court's decisions, it unreasonably applied that principle to the facts of the Petitioner's case. *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Had Petitioner not been advised by counsel to waive his right to testify, he would have testified that he had been living at his mother's house and was there the morning of the crime. (N.T. 4/27/18 pg. 120).

Between 10:00 am and 11:00 am., Rigney called him and they discussed Petitioner's buying some marijuana. (N.T. 9/10/13 pg. 115-116; N.T. 4/27/18 pg. 121, 125-126, 173-175).

Because Petitioner had been told just the day before by his parole officer not to leave the house until after 2:00 pm. Petitioner stayed there until it was just after that time. (N.T. 4/27/18 pg. 123).

His plan was to go see his cousin's baby while he waited to hook up with Rigney. (N.T. 4/27/18 pg. 123). Both his mother and a neighbor, Mrs. Pine saw him leave. Mrs. Pine was his mother's co-worker. She asked him to put her trash on the street for her, which Petitioner did. (N.T. 4/27/18 pg. 128).

Petitioner was on the phone during the half mile walk from his mother's house to Ridge and Master Streets. (N.T. 4/27/18 pg. 124). When he spoke with Rigney, Rigney told him that he was busy but that he could meet Petitioner at 23rd and Montgomery. (N.T. 4/27/18 pg. 176-177). Petitioner then called Rafiq Jones to see if he could pick him up at Ridge and Master Streets. (N.T. 4/27/18 pg.128).

Petitioner was still 'walking along the wall' going toward Ridge and Master at 2:30 pm when the crime was occurring elsewhere. (N.T. 4/27/18 pg. 129).

At 2:36 Petitioner received a call from his ex-girlfriend Joyce Lavender. (N.T. 4/27/18 pg. 130).

When he approached Ridge and Master Streets a white
Cadillac stopped and beeped its horn. He couldn't see who was
driving because the windows were so dark, so he kept walking. He
then heard someone yell out "Tez" which is his nickname.
Petitioner saw that it was Rigney and walked over to the car. He
and Rigney talked about the marijuana. Petitioner had no idea
where Rigney had gotten the drugs. (N.T. 4/27/18 pg. 131).

Rigney asked Petitioner where he was going and when
Petitioner told him his aunt's house to visit his cousin's baby,
Rigney told him to get in the car, that he would take him. (N.T.
4/27/18 pg.130-131) Petitioner got inside the backseat passenger
side of the car. (N.T. 4/27/18 pg. 131).

When they got to 24th and Ridge they pulled over and two
males who Petitioner had never met before (later identified as
Caray and Block) got out of the car and went inside the Chinese
Food store. (N.T. 4/27/18 pg. 131).

Rigney and Petitioner then drove down Ridge, made a right
onto 25th, a right onto Berks where they encountered James who
got inside the car. (N.T. 4/27/18 pg. 134). Petitioner had never
met James before this. (N.T. 4/27/18 pg.134, 165). Rigney asked
Petitioner if they could use his aunt's house to weigh the weed
so he could give Petitioner and James their cuts at the same
time. (N.T. 4/27/18 pg. 134).

When they got to and parked at Petitioner's aunt's house,
Rigney told James to take the trash bag out of the trunk. Rigney
reached under the seat and grabbed the scales and put them in
his hoodie and they walked inside the house on Judson St. (N.T.
4/27/18 pg. 134).

While the others went upstairs to the middle bedroom, the
Petitioner went down the hall to the bathroom. (N.T. 4/27/18 pg.
135). While he was in the bathroom Petitioner heard what turned
out to be "Caray" and "Block" knocking on the front door and
asking to enter. (N.T. 4/27/18 pg. 135-136). Petitioner heard
them come up the steps and then footsteps going down the stairs.
(N.T. 4/27/18 pg. 136). Petitioner yelled through the bathroom
door to Rigney "Who the Fuck is that?" No one responded. (N.T.
4/27/18 pg.136). Petitioner asked Rigney who had just left and
Rigney said it was Duke (James) and the 'young bull that was
with him" (N.T. 4/27/18 pg. 136).

Petitioner came out of the bathroom just as Rigney came out
of middle bedroom holding a black bag and a pink baby bag.
Rigney and Petitioner walked down the stairs. Rigney put the
black bag on the floor behind the couch. Rigney put the pink bag
on the floor next to the couch. (N.T. 4/27/18 pg. 137-138).

Petitioner sat down on the couch next to his cousin. She
then got up and asked him to watch the baby while she went to
the store. Rigney said that the 'young bulls' would be right

back- they had just gone round the corner to sell some pot.
(N.T. 4/27/18 pg. 138-139).

Without first knocking or announcing their presence, police
kicked in the closed, locked and screenless front door. (N.T.
4/27/18 pg. 135, 138-139). Petitioner had the baby in his arms
at the time. The police told Smith to take the baby from
Petitioner. She was told to sit on the couch by the pink bag.
Petitioner and Rigney were told to lay on the floor where they
were handcuffed. They were allowed to sit up next to each other
on the floor.

Contrary to the Commonwealth witness' testimony, the duffel
bag was neither on top of the dog cage or unzipped and open with
drugs in plain view. It was, where Rigney had left it, behind
the couch on the floor.

While the police were otherwise occupied looking for,
unzipping and searching the duffel bag they had taken from
behind the couch, Petitioner saw Rigney mouth to Smith to kick
the pink bag under the couch, which she did.

It was after the police found, opened and searched the
duffel bag that a complete sweep of the house was then
conducted. The pink baby bag and three handguns were also found.

## A.   Ineffective advice not to testify in support of the Motion to Suppress.

The trial court combined the suppression hearing with the trial. Petitioner could have testified for purposes of the suppression motion without fear of his testimony being admitted against him at trial.

When a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt. *Simmons v. United States*, 390 U.S. 377 , 394 (1968). Because of the *Simmons* rule, the Pennsylvania Supreme Court has stated that "(i)t is difficult to see how a motion to suppress incriminating evidence can *ever* be prejudicial to an accused, regardless of its chances for success." *Commonwealth v. Wheeler*, 541 A.2d 730, 735 (Pa. 1988).

Petitioner needed to testify on his own behalf for purposes of a motion to suppress in order to refute the Commonwealth witnesses and evidence.

Officer Ratka testified that he walked up the steps of the Judson Street house and "opened the screen door" (N.T. 9/9/13, pg. 225, 229-230). Officer Mertz similarly testified that "the front door was open and we just opened the screen door" and walked inside the house.(N.T. 9/9/13, pg. 203-204). Officer Kapusniak testified that he didn't know how his officer opened

the door (he could have kicked it in) but the front door was
'open'. (N.T. 9/9/13 pg. 139-140).

Officer Fox testified on cross-examination that he could
not see a screen door from that angle on the *single* photo of the
front door the Commonwealth presented. (N.T. 9/9/13, pg. 246-
247).

Petitioner's testimony that there was no screen on the
closed and locked front door and that the police kicked it in
was absolutely necessary to refute the police assertion that
there were exigent circumstances and that they did not need to
use any force to enter the Judson Street house. They just walked
right in. (N.T. 9/10/13 pg. 127).

Petitioner could have additionally testified that the
duffel bag was on the floor behind the couch and never on the
dog cage in plain view. Given that Rigney and Smith were
Commonwealth witnesses, Petitioner was the *only* person who could
have provided the factual basis for the Court to find that the
drugs inside the duffel bag were not found by police in plain
view.

Without the drugs being found in plain view, the police had
no basis to conduct the sweep of the house which uncovered the
pink baby bag with the guns.

Had Petitioner so testified, his counsel would have had the
evidentiary basis to then argue that the police only had

authority to hold the scene as an investigative detention
pending the obtaining of a search warrant. The sweep of the
house was unlawful and should be suppressed. Moreover, counsel
could have argued that the averments which formed the
evidentiary basis for the search warrant were inaccurate and/or
fabricated. (P11).

## B.   Ineffective advice not to testify for substantive trial purposes.

Had Petitioner testified for purposes of trial, he would
have told the Court that he was not involved in the murder.

While Petitioner met up with Rigney *after* the crime, it
was only to buy some marijuana. Petitioner had no idea that the
shooting had been just previously committed and/or that the
marijuana had been stolen from the victims' residence. Nor did
he have any idea that Rigney had taken guns from the crime
inside his Aunt's house. He never had physical possession of the
duffel bag, the trash bag or the pink baby bag.

Petitioner avers that the evidence that he could give was
so critical to his defense to warrant any limited potential risk
or prejudice there might be from putting Petitioner on the
stand. Prior to trial, Petitioner specifically told his trial
counsel that he wanted to testify about the above.

Petitioner testified that Mr. Rudenstein told him not to
testify because of his aggravated assault conviction and because

it would have been inconsistent with Officer Merz' testimony that he had seen James get out of the Kia and then get back in and drive away. (N.T. 4/27/18 pg. 147).[2]

At the PCRA hearing Mr. Rudenstein admitted that he could not recall having even discussed with the Petitioner why he should not testify. (N.T. 4/27/18 pg. 30-34,38-39; 7/20/18 pg. 4). Mr. Server, who had been delegated responsibility for the investigation of the alibi defense didn't speak with Petitioner about his testifying. (N.T. 4/27/18 pg. 19, 45, 149).

Petitioner's mother had been interviewed by a private investigator. The investigator reported that Petitioner's mother told her that her son's parole agent had been at her house the day of the crime. Neither Mr. Rudenstein nor Mr. Server spoke directly to Petitioner's mother. (N.T. 4/27/18 pg. 45). They relied exclusively on the single, very brief investigative interview done by an investigator. (N.T. 4/27/18 pg. 29).

When counsel then received Petitioner's parole records, which showed the parole agent made a field visit to Petitioner's house the day before the murder and not the day of the murder, counsel immediately abandoned any attempt to present

_____  __    _____  . .

[2]    It is uncontested that Petitioner had no prior crimen falsi convictions he could be impeached with if he took the stand. Nor had he made any prior inconsistent statements with which he could be impeached if he took the stand.

Petitioner's testimony and his alibi defense. Instead, Mr.
Rudenstein emailed his co-counsel:

> WHAT A PUTZ; WASTED YOUR TIME GETTING THE RECORDS AND
> MINE WITH THE ALIBI NOTICE AND TALKING ABOUT IT. Tell
> him to plead. I will (sp) dictate a letter telling
> him he has no real defense in going over the ev w (sp)
> him, I think he realized that. Need to cover
> ourselves. This guy has a real chance of going down.

(emphasis in original)(N.T. 4/27/18 pg. 15, 48; R.R.1-2). At the
recent hearing, Mr. Rudenstein described it as "a *grotesque*
waste of time." (emphasis added)(N.T. 4/27/18 pg. 35-36).

Petitioner was literally fighting for his life and yet,
counsel's reaction to his assertion of an alibi was that
Petitioner was a 'putz', which this court can take judicial
notice is defined as "a stupid or worthless person" who had
wasted counsel's time.

> Yeah, you're asking me straight out, was I upset with
> my client? Sure I was, because I felt that he kind of
> wasted our time either deliberately or because he just
> wasn't thinking straight.

(N.T. 4/27/18 pg. 46).

Before abandoning both Petitioner and his alibi defense,
Mr. Rudenstein didn't send Petitioner a copy of the alibi notice
or his mother's statement. Nor did counsel bother ask Petitioner
about the inconsistency between his mother's recollection and
the parole records.(N.T. 4/27/18 pg. 36-37, 144). Counsel
admitted at the PCRA hearing that he believed that Petitioner
was not accurately reporting what occurred. "Whether he was

lying or whether he was grossly mistaken, that *I can't really
say.*" (emphasis added) (N.T. 4/27/18 pg. 36).

Had counsel simply asked his client, Petitioner could have
cleared the misunderstanding up very quickly.[3] Petitioner had
told his attorney that he had been at his mother's house the
morning of the crime and had not left until shortly after 2:00
p.m. He did not leave the house the day of the crime earlier
than 2:00 pm because just the day before his parole officer, who
was on his first visit to his mother's house, had told him that
he was not allowed to leave the house until after 2:00 p.m.
(N.T. 4/27/18 pg. 120-121, 144, 179).

Counsel clearly misunderstood what his client had said.
Counsel critically misinterpreted Petitioner as having said that
his parole agent visited him *the day* of the crime. That
misinformation was then put in the Alibi Notice and was the
basis for the private investigator's questions to Petitioner's
mother.

When his mother was asked *almost three years after the
crime* by the private investigator if the parole agent had been
there the day of the crime, Petitioner's mother recalled that

---

[3]     While Mr. Server testified that he spoke to Petitioner
about the parole field records, his notes do not indicate what
Petitioner's response was.(N.T. 4/27/18 pg. 16, 20). Regardless,
Mr. Server did not discuss whether Petitioner should testify to
the alibi. He left that entirely up to Mr. Rudenstein to do.
(N.T. 4/27/18 pg. 19).

first visit and assumed they were referring to that day. Any reasonably experienced attorney would know that it is not at all unusual for a witness to not be able to immediately recall what they were doing on a specific date, especially a date almost three *years* earlier.[4]

Having summarily abandoned the alibi defense and thinking that his client was a 'putz' who was just wasting his time, counsel simply advised Petitioner not to testify. Counsel didn't sit down with the Petitioner to discuss the pros and cons of Petitioner testifying, even if his mother could not. Instead he sent Petitioner a letter telling him that his alibi was 'not strong' and that they would "discuss it further". (N.T. 4/27/18 pg. 30-34).

Mr. Rudenstein knew that the client's decision of whether to testify or not is a legally nuanced and very complex question. It requires more than simply a 'yes' or 'no' from counsel. Among other things, it requires a discussion of what the client could and could not say if he took the stand and what responses would 'open the door' to prejudicial information coming in. (N.T. 7/20/18 pg. 8-10). Mr. Rudenstein's attempt at the PCRA hearing to explain how Petitioner's aggravated assault

---

[4]     The crime occurred on December 8, 2010. Counsel did not interview Petitioner's mother until the end of August, 2013 - a month prior to the trial.

conviction may have been discussed in the context of his
testifying was difficult to follow. Even if counsel had this
discussion with the Petitioner, which there is no evidence he
did, if explained the same way counsel did at the PCRA hearing,
it had to have been very confusing to Petitioner.

Moreover, Mr. Rudenstein assertion that he would have been
'all for it' if Petitioner had wanted to testify is not credible
given the tone of counsel's email and letter to the Petitioner
advising him that he had no defense and that he should just take
a plea. (N.T. 4/27/18 pg. 39-40).

Counsels' decision not to at least advocate that Petitioner
testify to the alibi defense had no objectively reasonable basis
to advance the interests of the Petitioner.

Had Petitioner received objectively reasonable and
effective advice from his attorney he avers that he would have
testified, thus satisfying the prejudice requirement.
*Commonwealth v. Walker*, 110 A.3d 1000 (Pa. Super 2015);
*Strickland, supra; Commonwealth v. Mallory*, 941 A.2d 686 (Pa.
2008); *Commonwealth v. Miller*, 987 A.2d 638 (Pa. 2009).

Petitioner was not an attorney. He had every right to rely
on what his attorney told him was in his best interests to do.
Counsel told him that the Judge was going to ask him in multiple
different ways if he wanted to testify but that he should say
'no' each time. (N.T. 4/27/18 pg. 152).

The fact that Petitioner was colliquied is not dispositive of whether counsel gave objectively unreasonable advice when he told Petitioner not to testify. That fact goes to the 'voluntariness' of the waiver and not whether the waiver was 'intelligent'. If the fact that the defendant was colliquied was by itself sufficient to prove an 'intelligent' waiver then the Superior Court could have never found as it did in *Nieves* and *Walker* that counsel's erroneous advice made the waiver unintelligent. Notably, the defendants in both *Nieves* and *Walker* were colliquied on the record as Petitioner was.

There is a reasonable probability that, but for counsel's errors (particularly when considering the cumulative effect that Rigney's testimony and the phone records would have had), the result of the proceeding would have been different. The Commonwealth would not have been able to establish beyond a reasonable that Petitioner committed the robbery or the murder.

## II. After discovered evidence that the Commonwealth's key witness, Darryl Rigney, lied when he inculpated the Petitioner in the crime.

Rigney testified against Petitioner and his co-defendant as a cooperating co-conspirator. He pled guilty to third-degree murder.(N.T. 9/10/13 pg. 126) He received a sentence of nineteen (19) to thirty-eight (38) years.(N.T. 9/10/13 pg. 112,129-131,169,173-174). Petitioner was found guilty based exclusively

on Rigney's testimony. There was no physical or other eyewitness
testimony that Petitioner was in any way involved in the
robbery/murder. The Commonwealth could only place him as being
with Rigney and the drugs *after the fact.* However, even then,
they had no evidence that Petitioner even knew that the drugs
were the product of the crime.(N.T. 9/9/13 pg. 22-23; 9/10/13
pg. 136, 216-218).

While Petitioner knew that he was innocent and that Rigney
was lying when he implicated the Petitioner in the double
murder, the only evidence Petitioner had at the time of trial
that Rigney had lied was hearsay and circumstantial: Petitioner
presented the testimony of Kuzell Bivins and Tyrik Lark.[5]

Bivins testified that Rigney had been his cell mate:

> Well, we was one night he was crying. I mean he
> cried. He was crying a lot of nights, but one
> particular night he was saying how the two guys that
> he said supposed to had something to do with the
> homicide or was locked up wasn't the people that was
> supposed to been with him, something like that. . . .
> we talked about his case a lot. We talked about that
> situation a lot. So maybe about five or ten times, you
> know. . . (H)e told me that the two people that was
> supposed to been arrested for it wasn't the people.

(N.T. 9/11/13 pg. 99-102).

Lark testified that he too had been incarcerated with
Rigney and that he observed Rigney break down in front of him

---

[5]    Contrary to the Trial/PCRA Court's finding, it was the
Petitioner who presented these witnesses and not Mr. James.
(1/28/19 Opinion, pg. 3).

three times tearfully telling him that "Man like they got the wrong people really" "Man the cops said they must give me the drug charges if I just say that was them". "Man, like I don't know what I'm a do". (N.T. 9/11/13 pg. 111-112).

Despite the above witness testimony, the trial court found Rigney credible.

After his conviction, on or around December 20, 2013 Petitioner received one of what would become four letters from Rigney admitting for the very first time that Rigney had lied when he implicated the Petitioner at the trial.

In order to be entitled to relief based upon after-discovered evidence, the Petitioner must prove by a preponderance of the evidence that the evidence (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted. 42 Pa.C.S. § 9543(a)(2)(vi); *People ex rel. Oelricks v. Superior Court of City of New York*, 10 Wend. 285 (1833); *Commonwealth v. Walker*, 36 A.3d 1, 14 (Pa. 2011); *Commonwealth v. Washington*, 927 A.2d 586,  595-596 (Pa. 2007);*Commonwealth v. Foreman*,55 A.3d 532, 537 (Pa.Super. 2012); *Commonwealth v. Abu-Jamal*,553 Pa. 485, 720 A.2d 79, 94 (Pa. 1998).

In the first letter Rigney wrote:

> Im sending you this letter and I dont really know what
> to say or how to say it, but im truly sorry for
> putting you in all this mess. I just want to try and
> explain what I was going through at the time I lied on
> you by putting your name in that situation. Those
> people found those guns and started throwing double
> life at me Dawg. I got kids out there that I was tryna
> get back to, Plus that shit shook me up like crazy. I
> never had to face anything like that in my life. I was
> telling the police the truth at first but they kept
> throwing your name out there telling me to help
> myself. I was looking for a way out and wasn't
> thinking about putting a friend into something he had
> nothing to do with. I got myself somewhat a deal out
> the situation but it dont make me feel any better
> knowing you are locked up forever for nothing Im hurt
> by what I did to you Dawg. I wish I had the heart to
> tell the truth at court, but again I was thinking
> about myself and my family. I know that if I told the
> truth, I would not have gotten the deal I got. I was
> scared dawg, as crazy as it sound I really was. If you
> are not too upset with me, write me and tell me who
> should I talk to and get the truth out there to help
> you. Once again Tez Im sorry Dawg. If you can find it
> in your heart to forgive, please do, if not I
> understand.

(R.R. 7-8). In a second letter Rigney wrote:

> Yo Tez Dawg Im sorry for what I did Dawg. Im also
> sorry for lying on you. Those people found those guns
> & started throwing double life at me Dawg and I got
> those kids out there that I was tryna get back to.
> That shit shook me up homie. All the shit I done did
> all the shit me and my Boyz parked out there I never
> thought in a million that I would become this.[6] Im hurt
> just as well as you. What I did to you hurt me Dawg.
> Im going do whatever it is that I gotta do to make it
> right with you. Whatever Bro, yo dawg I lied to police
> & in court because I was scared dawg, as crazy as it
> sound, I really was. However you need me in the court
> Im gonna help you dawg.

----

[6]     According to the Petitioner, "parked" is street slang for
"killed or murdered".

(R.R. 13). In a third letter Rigney wrote:

> Yo Tez Ima help you get back home Dawg. I know I was
> wrong but yall was wrong also for letting go down for
> yall shit knowing all the shit and responsibilities I
> left behind two 7 year olds Dawg. I know my apology is
> not excepted but for what its worth Dawg Ima do what I
> gotta do to get you back in court. My word Dawg. Let
> me know the precedures that we must take and Ima help
> you out.

(R.R. 14). In a fourth letter, Rigney wrote:

> Tez what's up bro! I know it took me a little longer
> than expicted to get back wit you but to keep it short
> and brief Im ready! Affidavit or what ever it takes to
> help you and duke. Just let me know where to start. My
> people is up here and he knows how to do that law
> work. He knows my situation and he's willing to help
> me help yall. Write to him and give him step by step
> on how you would like to approach this situation. Send
> me duke info also Im tryna get this shit wrapped up
> for yall. I cant leave yall like that. Write to me
> or/and my people we up Albion. (Brian Young DL3506
> Darryl Rigney LF1056) P.S. I can't take back what
> happened but I can do what it takes to help yall get
> back out.

(R.R.15).

Rigney testified at the PCRA hearing that it was really

"Block" and "Caray" who had committed it. (N.T. 4/27/18 pg. 54,

59-60). [7] Rigney had picked the Petitioner up in the white

Cadillac *after* the crime had already been committed. Rigney let

"Block" and "Caray" out so that they could get something from a

---

[7]    Recantation testimony such as this can form the basis of
after discovered evidence, even though the defendant knew
(because he was innocent) that the witness had been lying at
trial. *Commonwealth v. Loner*, 2003 PA Super. 393, 836 A.2d
125(Pa. Super. 2003) (*en banc*), *appeal denied*, 578 Pa.699, 852
A.2d 311 (2004).

store. (N.T. 4/27/18 pg. 106-108, 115-116). Rigney then drove
Petitioner to his aunt's house. They got out and went upstairs.
Rigney went into a bedroom and when "Block" and "Caray" arrived
at they went upstairs to the bedroom where Rigney and the drugs
were. "Caray" asked "Block" did he 'finish her' to which "Block"
replied, "guarantee". Petitioner was not even in the room at the
time.

        Prior to the trial, Rigney had told the DA and his attorney
that it was "Block" and "Caray" who committed the crime. (N.T.
4/27/18 pg. 81-82). His attorney however advised him to just
take the deal otherwise he would get two life sentences.
Rigney's self-interest ultimately won out. (N.T. 4/27/18 pg. 60-
61).

        After the trial was over Rigney's conscious however began
to bother him. At considerable risk to his own penal interests,
he came forward to admit that he had lied when he implicated the
Petitioner in the crime. Petitioner had no reason to believe
before that time that Rigney would admit his lies, particularly
since he had so much to lose by doing so. Not only would he lose
the benefit of his cooperation agreement, he could also possibly
be charged with perjury. Moreover, he was very conscious of the
fact that if other inmates learned that he had lied on the
Petitioner he would be considered by them to be a 'rat' and his
life could be in danger. (N.T. 4/27/18 pg. 77).



## Fw: Montez Bethea

DAVID RUDENSTEIN <lasallescreamer@msn.com>
Tue 4/24/2018, 3:19 PM
To:mrudenstein@msn.com <mrudenstein@msn.com>,
Print this out-for me, only, for Friday

From: DAVID RUDENSTEIN <lasallescreamer@msn.com>
Sent: Saturday, August 24, 2013 10:09 AM
To: philacrimelawyer@aol.com
Subject: RE: Montez Bethea

WHAT A PUTZ; WASTED YOUR TIME GETTING THE RECORDS ANDF MINE  WITH THE ALIBI NOTICE
AND TALKING ABOUT IT. Tell him to plead. I willo dictate a letter telling him he has no real defense-
In going over the ev. w him, I think he realized that. Need to cover ourselves. This guy has a real
chance of going down.

> Subject: Montez Bethea
> From: philacrimelawyer@aol.com
> Date: Sat, 24 Aug 2013 08:25:30 -0400
> CC: nmassmsw@aol.com; kh33@drexel.edu; dahmir122@verizon.net
> To: lasallescreamer@msn.com
>
> Well the rest of the state parole records came today. They contain the field notes. And they
disprove alibi. The murder was December 8. Montez was visited the day before on December 7. On
December 7 he was given a warning not to leave his house under any circumstances. Of course on
the 8th he was arrested at another location.
>
> I guess I'll try to see him tomorrow to give him the news and to try to talk him into a bifurcated
waiver or a plea. But since the co-defendant demanded a jury and Montez wants to go along with his
buddy we should count on this being a jury trial and going to penalty stage.
>
> Nadine, I need your supplemental request now. It can't wait any longer.
>
> GS
>
> Sent from my iPad

R.RI   PI



From: DAVID RUDENSTEIN <lasallescreamer@msn.com>
Sent: Saturday, August 24, 2013 10:09 AM
To: philacrimelawyer@aol.com
Subject: RE: Montez Bethea

WHAT A PUTZ; WASTED YOUR TIME GETTING THE RECORDS ANDF MINE WITH THE ALIBI NOTICE AND TALKING ABOUT IT. Tell him to plead. I willo dictate a letter telling him he has no real defense-in going over the ev. w him, I think he realized that. Need to cover ourselves. This guy has a real chance of going down.

> Subject: Montez Bethea

> From: philacrimelawyer@aol.com

> Date: Sat, 24 Aug 2013 08:25:30 -0400

> CC: nmassmsw@aol.com; kh33@drexel.edu; dahmir122@verizon.net

> To: lasallescreamer@msn.com

>

> Well the rest of the state parole records came today. They contain the field notes. And they disprove alibi. The murder was December 8. Montez was visited the day before on December 7. On December 7 he was given a warning not to leave his house under any circumstances. Of course on the 8th he was arrested at another location.

>

> I guess I'll try to see him tomorrow to give him the news and to try to talk him into a bifurcated waiver or a plea. But since the co-defendant demanded a jury and Montez wants to go along with his buddy we should count on this being a jury trial and going to penalty stage.

>

> Nadine, I need your supplemental request now. It can't wait any longer.

>

> GS

>

RR2

MY
CORY

Doc 4
RECEIVED
07/03/2013 02:19:40 AM
ACTIVE CRIMINAL INCOMING
CRIMINAL MOTION COURT
By A. SCO

DAVID RUDENSTEIN, ESQUIRE                    Appt · June 2011
Attorney at Law
Attorney I.D. No. 33023
9411 Evans Street
Philadelphia, PA 19115
Email: mrudenstein@msn.com                   Attorney for Defendant
Tel: (215) 464-7890 Fax: (215) 464-7891

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | COURT OF COMMON PLEAS |
| Plaintiff | : | PHILADELPHIA COUNTY |
| | : | CRIMINAL TRIAL DIVISION |
| v. | : | |
| | : | **CP-51-CR-0009460-2011** |
| **MONTEZ BETHEA,** | : | **PP# 761764** |
| Defendant | : | |

## NOTICE OF ALIBI

The Defendant, Montez Bethea, by and through his court appointed attorney, David

Rudenstein, hereby notifies the Commonwealth of Pennsylvania that, at time of trial, the

defense may present evidence of alibi and, if so, the following witnesses may be called:

**1.** **Denise Page**; work address of Girard College, 21st and Corinthian Avenues,

Philadelphia, PA. In sum, the witness Page is the mother of the Defendant Bethea and

has stated that on the day of the incident, December 8, 2010, she was at home, located

at 21st and Corinthian Avenue, where she works at Girard College as a residential advisor.

She said that the Defendant was with her.   They waited for Probation Officer Jose

Rodriquez, who showed up at 12:30 PM and did not leave until 2:00 PM, or even a little

later.  A copy of the witness' statement, taken by private investigator, Sharon Williams,

is being forwarded under separate cover, to the District Attorney's office.

RR3 P2

**2.**    **Ms. Macedonin Pine**; who also gave the address of Girard College, 21st and Corinthian Avenue, Philadelphia, PA.    She identified herself as a co-worker of the Defendant's mother.  While she could not remember the exact date, she did recall seeing the Defendant with his mother at the college and remembers it because he offered to help take out her trash.

Respectfully submitted by:


s/ David Rudenstein
DAVID RUDENSTEIN, Esquire
Attorney for Defendant Bethea

2

RR4

DAVID RUDENSTEIN, ESQUIRE          Appt. June 2011
Attorney at Law
Attorney I.D. No. 33023
9411 Evans Street
Philadelphia, PA 19115
Email: mrudenstein@msn.com          Attorney for Defendant
Tel: (215) 464-7890 Fax: (215) 464-7891

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | COURT OF COMMON PLEAS |
| Plaintiff | : | PHILADELPHIA COUNTY |
| | : | CRIMINAL TRIAL DIVISION |
| v. | : | |
| | : | **CP-51-CR-0009460-2011** |
| **MONTEZ BETHEA,** | : | **PP# 761764** |
| Defendant | : | |

# PROOF OF SERVICE

    I hereby certify that I am, this **3rd** day of **JULY , 2013 ,** serving the foregoing document(s) upon the person(s) and in the manner indicated below:

Service by Electronic Service and/or First Class Mail addressed as follows:

District Attorney of Philadelphia          (215) 686-8042
Homicide Unit
Three South Penn Square
Corner of Juniper & South Penn Square
Philadelphia, PA  19107

Attention:    ADA Richard Sax, Esquire


                    __s/ David Rudenstein_____ _ ___
                    DAVID RUDENSTEIN, Esquire

RR5



# DAVID S. RUDENSTEIN
## Attorney at Law
Phone:  215-464-7890  --  Fax:  215-464-7891
Member PA & NJ Bar

**INMATE/CERTIFIED MAIL TO:**
*Blue Grass Plaza*
*2417 Welsh Road,  Box # 501*
*Philadelphia, PA   19114*

**ALL OTHER MAIL TO:**
*9411 Evans Street*
*Philadelphia, PA   19115*

July 3, 2013

Mr  Montez Bethea
PPN 761764
PICC
8301 State Road
Philadelphia, PA    19136

Dear Mr. Bethea:

In the past week, I have spoken to Mr. Server, spoken to Ms. Williams and have again reviewed Sharon's witness statements on the alibi.  I do not believe that the alibi is strong; however, I have filed a Notice of Alibi on your behalf.  We will have to make a further decision at time of trial as to whether you wish to use the alibi.  It is my professional opinion that the use of an alibi that the jury might not believe can be extremely dangerous for a defendant as the jury could figure that you are attempting to lie to them or putting up someone who is lying.  Moreover, an alibi that rests entirely upon the testimony of one's mother, is not strong, for obvious reasons.  However, this is something that we can further discuss.  Gary, in an effort to help me, will get a Court Order from Judge Bronson for the probation officer's records.

I am taking a few days off until after July 8 but I am going to mark my calendar and plan to visit with you at some point between July 12 and July 20.  I will set aside an extensive period of time where we will review the case from A to Z and begin to make final preparations for the trial that will begin in September.  If you have any questions or concerns, please put them down on paper and, when I call you out at the prison visit, please bring it with you.  Again, I will attempt to answer everything on my next prison visit.  Thank you.

Very truly yours,

David Rudenstein
DSR/mer

cc:    Gary S. Server, Esquire

**EXHIBIT**

RR6   P3

(10)

TEZ WHAT'S UP DAWG.
Im SENDING you THIS LETTER AND I DON'T
REALLY KNOW WHAT TO SAY OR HOW TO SAY IT, BUT I
TRULY SORRY FOR PUTTING YOU IN ALL THIS MESS..
JUST WANT TO TRY AND EXPLAIN WHAT I WAS
GOING THROUGH AT THE TIME I LIED ON YOU BY
PUTTING YOUR NAME IN THAT SITEATION.. THESE
PEOPLE FOUND THOSE GUNS AND STARTED THROWIN
DOUBLE LIFE AT ME DAWG. I GOT KIDS OUT
THERE THAT I WAS TRYNA GET BACK TO, PLUS
THAT SHIT SHOOK ME UP LIKE CRAZY. I NEVER
HAD TO FACE ANYTHING LIKE THAT IN MY LIFE.
I WAS TELLING THE POLICE THE TRUTH AT FIRST
BUT THEY KEPT THROWING YOUR NAME OUT THERE
TELLING ME TO HELP MYSELF. I WAS LOOKING FO
A WAY OUT AND WASNT THINKING ABOUT PUTT
A FRIEND INTO SOMETHING HE HAD NOTHIN
TO DO WITH, I GOT MYSELF SOME-WHAT A DEAL
OUT THE SITUATION BUT IT DONT MAKE ME FEEL ANY
BETTER KNOWING YOU ARE LOCKED UP FOREVER FOR NOTHIN
IM HURT BY WHAT I DID TO YOU DAWG., I WISH I HA
THE HEART TO TELL THE TRUTH AT COURT, BUT AGAIN I
WAS THINKING ABOUT MYSELF AND MY FAMILY., I
KNOW THAT IF I TOLD THE TRUTH, I WOULD NOT HAVE
GOTTEN THE DEAL I GOT. I WAS SCARED DAWG,
CRAZY AS IT SOUND I REALLY WAS, IF YOU ARE NOT
UPSET WITH ME →

888

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

FOR SLEEP
GIVE TO TEZ

Commonwealth of Pennsylvania
Department of Corrections

INSTRUCTIONS
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. To: (Name and Title of Officer)

2. Date:

3. By: (Print Inmate Name and Number)

Inmate Signature

4. Counselor's Name

5. Unit Manager's Name

6. Work Assignment

7. Housing Assignment

8. Subject: State your request completely but briefly. Give details.

9. Response: (This Section for Staff Response Only)

LT-1056
Darryl Rigney

WRITE ME AND TELL ME WHO SHOULD I TALK TO AND GET
THE TRUTH OUT THERE TO HELP YOU. ONCE AGAIN TEZ
I'M SORRY DAWG. IF YOU CAN FIND IT IN YOUR HEART
TO FORGIVE, PLEASE DO, I'M NOT UNDERSTAND

To DC-14 CAR only ☐ To DC-14 CAR and DC-15 IRS ☐

Staff Member Name

Print Sign

Date

135

Revised July 2000

**FORM OF AFFIDAVIT**

FILED

JUL 1 8 2017

PCRA Unit
CP Criminal Listings

15

COMMONWEALTH OF PENNSYLVANIA )
COUNTY OF ERIE )

Before me the subscriber personally appeared _Darryl Rigney_

to me known, or satisfactorily proven to be , who being duly sworn according to law, doth depose

and say I Am writing You today to Confirm the
information that I supplied in the four (4) letter's
that I sent to Your client's family. I am in fact the Author
of those letter's. I'm prepared to cooperate and provide you with All the
Necessary and detailed information to assist Your client. first i would like to make
note that i was Not forced, threaten, Nor was i Coerse in any way. i am coming forw
at my own free will, because i want the truth to get put out their about your client.
Please see below the fact's that I am willing to confirm and if need be, testify to under
(1) that i am the author of the letter's you have. (2) that i was Actually on the phone
with your client at the time the murder's occured. (3) I DID in Fact called your
client the morning of the crime (4) Your Client came to the Judson street house
After the fact. (5) Your client was Not in the white Cadilac, when I drove
to the victim's house. The undersigned Does hereby state that the Fact's in the
Attached statement are true and correct (or are true and correct to the best of
my knowledge, information and belief) And I expect to be Able to prove the sam
At a hearing held in this matter. I understand that the statements herein are made subj.
to the penalties of 18 PA. § 5. 4904 (Relating to unsworn falsification and further deponent sayeth not.
to Authorities)

_Darryl Rigney_ _____ 7·6·17
(Signature of affiant) (Date)

SWORN TO AND SUBSCRIBED before me, a Notary Public of this Commonwealth

This 6 day of July , 2017, by _[signature]_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Robin L. Nyberg, Notary Public
Conneaut Twp., Erie County
My Commission Expires Aug. 11, 2019

RR9

EXHIBIT
P5

**FILED**

**FORM OF AFFIDAVIT**

JUL 1 8 2017

PCRA Unit
CP Criminal Listings

COMMONWEALTH OF PENNSYLVANIA        )
COUNTY OF ERIE                                        )

Before me the subscriber personally appeared   Darryl Rigney

to me known, or satisfactorily proven to be , who being duly sworn according to law, doth depose

and say  I Am writing You today to Confirm the
information that I supplied in the four (4) Letter's
that I sent to your Client's family. I Am "in fact" the Author
of those Letter's. I'm Prepared to cooperate and Provide you with All the
Necessary and detailed information to assist your client. first i would like to make
note that i was not forced, threaten, nor was i coarse in any way. i am coming forw
at my own free will, because i want the truth to get put out their about your client.
Please see below the fact's that I Am willing to confirm and if need be, Testify to under
(1) that i Am the author of the letter's you have. (2) that i was Actually on the Phone
with your client at the time the murder's occured. (3) I DID in "Fact" called your
client the morning of the crime. (4) Your Client came to the Judson street house
After the fact. (5) Your client was "not" in the white Cadilac, when I drove
to the victim's house. The undersigned Does hereby state that the Fact's in the
Attached statement are true and correct (or are true and correct to the best of
my knowledge, Information and Relief) And I expect to be Able to prove the sam
At a hearing held in this matter. I understand that the statements herein are made sub. J.
to the penalties of 18 PA. f.s.º4904 (Relating to unsworn falsification and further deponent sayeth not.
to Authorities)

Darryl Rigney                                 7·6·17
(Signature of affiant)                         (Date)

SWORN TO AND SUBSCRIBED before me, a Notary Public of this Commonwealth

This  6  day of  July  , 2017, by

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Robin L. Nyberg, Notary Public
Conneaut Twp., Erie County
My Commission Expires Aug. 11, 2019

**EXHIBIT**

RR10

**FORM OF AFFIDAVIT**

COMMONWEALTH OF PENNSYLVANIA )
COUNTY OF ERIE )

Before me the subscriber personally appeared ___Darryl Rigney___

to me known, or satisfactorily proven to be , who being duly sworn according to law, doth depose

and say ___I Am writing You today to Confirm the information that I supplied in the four (4) Letter's that I sent to Your Client's family. I am in "fact" the Author of those letter's. I'm Prepared to Cooperate and Provide you with All the Necessary and detailed information to assist your client. first i would like to make note that i was not forced, threaten, nor was i Coerse in any way. i am coming forward at my own free will, because i want the truth to get put out their about your client. Please see below the fact's that I am willing to confirm and if need be, testify to under oath. (1) that i am the author of the letter's you have. (2) that i was actually on the phone with your client at the time the murder's occured. (3) I DID in "FACT" called your client the morning of the crime (4) Your Client came to the Judson Street house After the fact. (5) Your client was "not" in the white Cadilac when I drove to the victim's house. The undersigned Does hereby state that the Fact's in the Attached statement are true and correct (or are true and correct to the best of my knowledge, Information and Relief) And I expect to be Able to prove the same At a hearing held in this matter. I understand that the statements herein are made subject to the penalties of 18 PA. C.S. 4904 (Relating to unsworn falsification to Authorities)___ and further deponent sayeth not.

___Darryl Rigney___                    ___7·6·17___
(Signature of affiant)                    (Date)

SWORN TO AND SUBSCRIBED before me, a Notary Public of this Commonwealth

This _6_ day of _July_ , 20_17_, by _Robin L. Nyberg_ .

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Robin L. Nyberg, Notary Public
Conneaut Twp., Erie County
My Commission Expires Aug. 11, 2019

RR11

Name _Darryl Rigney_

Number _LF1056_

Unit/Side _____
10745 Route 18
Albion, PA 16475-0002

Inmate Mail
PA Dept of
Corrections



US POSTAGE >> PITNEY BOWES

ZIP 16401   $ 000.46⁰
02 4W
0000334556 JUL 11 2017

TERi B Himebaugh Lawyer
2201 Penna. Ave #513
Phila, Penna 19130

12

| Form DC-135A | Commonwealth of Pennsylvania |
| --- | --- |
| **INMATE'S REQUEST TO STAFF MEMBER** | Department of Corrections |

**INSTRUCTIONS**

Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently

| 1 To (Name and Title of Officer) | 2. Date |
| --- | --- |
| 3 By (Print Inmate Name and Number) | 4. Counselor's Name |
| | 5. Unit Manager's Name |
| Inmate Signature | |
| 6. Work Assignment | 7 Housing Assignment |

8. Subject. State your request completely but briefly Give details

YO TEX IMA HELP YOU GET BACK HOME DAWG
I KNOW I WAS WRONG BUT YALL WAS WRONG ALSO FOR
LETTING A DOWN FOR YALL SHIT KNOWING ALL THE SHIT
I AND RESPONSIBILITIES I LEFT BEHIND TWO 7
YEAR OLDS DAWG. I KNOW MY ADA ADY IS NOT
EXCEPTED BUT FOR WHAT ITS WORTH DAWG IMA
DO WHAT I GOTTA DO TO GET YOU BACK IN
COURT. MY WORD DAWG
LET ME KNOW THE PRECEDURES THAT WE MUST
TAKE AND IMA HELP YOU OUT.

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
| --- | --- |

Staff Member Name _____ / _____ Date _____
Print                         Sign

Revised July 2000

RR12

**EXHIBIT**

P7

MY COPY  (11)

| Form DC-135A<br><br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections |
|---|---|
| | **INSTRUCTIONS**<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
| 1.  To. (Name and Title of Officer) | 2   Date· |
| 3.  By. (Print Inmate Name and Number) | 4.  Counselor's Name |
| _____<br>Inmate Signature | 5.  Unit Manager's Name |
| 6   Work Assignment | 7.  Housing Assignment |

8.  Subject: State your request completely but briefly.  Give details.

YO TE / DANG IM SORRY FOR WHAT I DID DAWG
IM ALSO SORRY FOR THING ON YOU... THOSE PEOPLE FOUND
THOSE GUNS & STARTED THROWING DOUBLE LIFE AT ME
DAWG AND I GOT THOSE KIDS OUT THERE THAT I WAS TRYNA
AGT BACK TO THAT SHIT SHOOK ME UP HOMIE, ALL THE
SHIT I DONE DID ALL THE SHIT MY AND MY BOYZ PARKED
OUT THERE I NEVER THOUGHT IN A MILLION THAT I
WOULD BECOME THIS, IM HURT JUST AS WELL AS YOU
WHAT I DID TO YOU HURT ME DAWG, IM GOIN DO YUHHT
EVER IT IS THAT I GOTTA DO TO MAKE IT RIGHT WITH
YOU ... WHATEVER BRO, YO DAWG I LIED TO POLICE & IN COURT
BECAUSE I WAS SCARED DAWG, AS CRAZY AS IT SOUND, I REALLY WAS
HOW EVER YOU NEED ME IN THE COURTS IM GONNA HELP YOU DAWG.

| To DC-14 CAR only   ☐ | To DC-14 CAR and DC-15 IRS   ☐ |
|---|---|

Staff Member Name _____ / _____ Date ____
                        Print            Sign

Revised July 2000

**EXHIBIT**
RRB   P6

(Back Side)

GIVE TO TEZ

RR 14

MY Copy (13)

Tez

what's up bro! I Know it took me Alittle longer that than expected to get back wit you. but to keep it short and brief I'm ready! Affidavit or what ever it takes to help you and duke. Just let me Know where to start My people is up here and he Knows how to do that law work. He Knows my situation and he's willing to help me help yall, Write to him and Give him step by step on how you would like to approach this situation, Send me duke Info Also I'm tryna get this shit wrapped up for yall. I wont leave yall like that. Write to me or/and my people we up Albion (Brien Young IX-3506) (Darryl Rignof LF-1056)

PS. I can't take back what happened but I can do what It takes to help yall get back out.

RR15

EXHIBIT
P8

P's records

R.R 18

**metroPCS**

Call Details

Search Number: 2155261798 Search Dates: 12/7/2010 - 12/8/2010

| Date | Time | Dur | Type | From | To | Status | Call Feature | Other Number | City | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/7/2010 | 07:10:07 | 0.26 | Outgoing Call | 2676503646 | 2676503646 | Not Answered | | | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 07:21:37 | 11:49 | Incoming Call | | 2155261798 | Answered | | 2676503646 | Philadelphia | 3 | 492 | 3 | 486 |
| 12/7/2010 | 09:15:08 | 1:14 | Incoming Call | | 2155261798 | Answered | | 2155881134 | Philadelphia | 3 | 486 | 3 | 486 |
| 12/7/2010 | 10:12:44 | 0.02 | Incoming Call | 76*2155261798 | 2155261798 | Answered | Call FWD - No Reply | 2673079391 | Philadelphia | 3 | 486 | 3 | 486 |
| 12/7/2010 | 10:57:47 | 0.59 | Outgoing Call | 2679713604 | 2679713604 | Answered | | | Philadelphia | 3 | 486 | 3 | 486 |
| 12/7/2010 | 11:00:00 | 0.13 | Outgoing Call | 2154001381 | 2154001381 | Answered | | | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 11:27:54 | 0.17 | Outgoing Call | 2155881134 | 2155881134 | Answered | | | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 11:28:44 | 0:32 | Outgoing Call | 2152609444 | 2152609444 | Answered | | | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 11:30:50 | 0.05 | Incoming Call | 76*2155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 11:44:52 | 18:21 | Outgoing Call | 2154001381 | 2154001381 | Answered | | | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 12:11:25 | 0.52 | Incoming Call | | 2155261798 | Answered | | 2155881134 | Philadelphia | 3 | 486 | 6 | 486 |
| 12/7/2010 | 12:42:57 | 0.26 | Incoming Call | | 2155261798 | Answered | | 2679713604 | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 12:47:02 | 5.40 | Incoming Call | | 2155261798 | Answered | None | 2673333317 | Philadelphia | 3 | 486 | 3 | 486 |
| 12/7/2010 | 12:47:32 | 0.50 | Incoming Call | | 2155261798 | Answered | Call Waiting | 2152071484 | Philadelphia | 3 | 486 | 3 | 486 |
| 12/7/2010 | 13:08:30 | 0.50 | Incoming Call | | 2155261798 | Answered | | 2152071484 | Philadelphia | 3 | 486 | 3 | 486 |
| 12/7/2010 | 13:09:43 | 1.28 | Incoming Call | | 2155261798 | Answered | | 2679713604 | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 13:12:42 | 0.05 | Incoming Call | 76*2155261798 | 2155261798 | Answered | Call FWD - No Reply | 2679713604 | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 13:26:30 | 0:43 | Outgoing Call | 2156611004 | 2156611004 | Answered | | | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 13:56:33 | 0.06 | Incoming Call | 76*2155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 13:57:15 | 0.05 | Incoming Call | 76*2155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 14:10:32 | 0.11 | Outgoing Call | 2679713604 | 2679713604 | Not Answered | | | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 14:11:00 | 0.03 | Outgoing Call | 2679713604 | 2679713604 | Not Answered | | | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 14:11:38 | 0:28 | Outgoing Call | 2679713604 | 2679713604 | Answered | | | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 14:36:35 | 0.04 | Incoming Call | 76*2155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | 3 | 486 | 3 | 486 |
| 12/7/2010 | 14:47:58 | 0.21 | Incoming Call | | 2155261798 | Answered | | 2155310694 | Philadelphia | 1 | 492 | 1 | 492 |
| 12/7/2010 | 14:48:46 | 0:29 | Outgoing Call | 2156881813 | 2156881813 | Answered | | | Philadelphia | 4 | 486 | 4 | 486 |
| 12/7/2010 | 15:02:36 | 1:13 | Incoming Call | | 2155261798 | Answered | | 2674811735 | Philadelphia | 6 | 486 | 6 | 486 |
| 12/7/2010 | 15:05:45 | 0.19 | Outgoing Call | 2673079391 | 2673079391 | Not Answered | | | Philadelphia | 3 | 491 | 5 | 491 |
| 12/7/2010 | 15:08:06 | 0.10 | Outgoing Call | 2673079391 | 2673079391 | Not Answered | | | Philadelphia | 6 | 486 | 6 | 486 |
| 12/7/2010 | 15:17:00 | 0:10 | Outgoing Call | 2673079391 | 2673079391 | Not Answered | | | Philadelphia | 5 | 491 | 5 | 491 |
| 12/7/2010 | 15:36:33 | 8:56 | Incoming Call | | 2155261798 | Answered | | 2673079391 | Philadelphia | 3 | 491 | 5 | 486 |
| 12/7/2010 | 15:52:50 | 0.09 | Outgoing Call | 2675884100 | 2675884100 | Not Answered | | | Philadelphia | 2 | 493 | 2 | 493 |
| 12/7/2010 | 15:53:49 | 0:22 | Outgoing Call | 2673079391 | 2673079391 | Answered | | | Philadelphia | 2 | 493 | 2 | 493 |
| 12/7/2010 | 16:04:56 | 0:02 | Incoming Call | | 2155261798 | Not Answered | | 2675884100 | Philadelphia | 6 | 486 | 6 | 486 |
| 12/7/2010 | 16:05:01 | 0.17 | Outgoing Call | 2675884100 | 2675884100 | Answered | | | Philadelphia | 6 | 486 | 6 | 486 |
| 12/7/2010 | 16:05:20 | 0:06 | Incoming Call | 76*2155261798 | 2155261798 | Answered | Call FWD - Busy | 2155881134 | Philadelphia | | | | |
| 12/7/2010 | 16:05:39 | 0.05 | Incoming Call | 76*2155261798 | 2155261798 | Answered | Call FWD - No Reply | 2155881134 | Philadelphia | 6 | 486 | 6 | 486 |
| 12/7/2010 | 16:06:02 | 0:21 | Outgoing Call | 2673333317 | 2673333317 | Answered | None | | Philadelphia | 6 | 486 | 6 | 486 |
| 12/7/2010 | 16:06:26 | 0:24 | Outgoing Call | 2673333317 | 2673333317 | Answered | None | | Philadelphia | 6 | 486 | 6 | 486 |
| 12/7/2010 | 16:11:46 | 0:27 | Incoming Call | | 2155261798 | Answered | | 2673079391 | Philadelphia | 6 | 486 | 6 | 486 |
| 12/7/2010 | 16:22:55 | 0.07 | Outgoing Call | 2152841429 | 2152841429 | Answered | | | Philadelphia | 1 | 478 | 1 | 478 |



EXHIBIT
P9

# metroPCS.

Call Details



| Date | Time | Dur | Call Type | Number A | Number B | Status | Note | Number C | City | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/7/2010 | 16:56:33 | 0:28 | Incoming Call | | 2155261796 | Answered | None | 2673332828 | Philadelphia | 1 | 470 | 1 | 470 |
| 12/7/2010 | 17:04:56 | 2:30 | Outgoing Call | 2676946730 | 2676946730 | Answered | | | Philadelphia | 6 | 457 | 1 | 470 |
| 12/7/2010 | 17:07:43 | 0:29 | Outgoing Call | 2154326990 | 2154326990 | Answered | | | Philadelphia | 1 | 470 | 1 | 470 |
| 12/7/2010 | 17:29:07 | 0:49 | Incoming Call | | 2155261796 | Answered | None | 2673333317 | Philadelphia | 1 | 470 | 1 | 470 |
| 12/7/2010 | 17:39:40 | 1:24 | Outgoing Call | 2152841429 | 2152841429 | Answered | | | Philadelphia | 6 | 457 | 6 | 457 |
| 12/7/2010 | 17:59:15 | 0:06 | Incoming Call | 7612155261796 | 2155261796 | Answered | Call FWD - No Reply | 2154103312 | Philadelphia | 1 | 469 | 1 | 469 |
| 12/7/2010 | 18:43:35 | 0:56 | Incoming Call | | 2155261796 | Answered | | 2154326990 | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 18:43:48 | 11:14 | Incoming Call | | 2155261796 | Answered | Call Waiting | 2673079391 | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 19:10:12 | 0:20 | Outgoing Call | 2673332828 | 2673332828 | Answered | None | | Philadelphia | 3 | 477 | 3 | 477 |
| 12/7/2010 | 19:10:44 | 0:24 | Outgoing Call | 2158861134 | 2158861134 | Answered | | | Philadelphia | 5 | 477 | 5 | 477 |
| 12/7/2010 | 19:12:41 | 0:28 | Outgoing Call | 2158861134 | 2158861134 | Not Answered | | | Philadelphia | 5 | 477 | 5 | 477 |
| 12/7/2010 | 19:13:28 | 1:16 | Incoming Call | | 2155261796 | Answered | | 2154326990 | Philadelphia | 3 | 477 | 5 | 477 |
| 12/7/2010 | 19:17:05 | 0:26 | Outgoing Call | 2675884100 | 2675884100 | Answered | | | Philadelphia | 5 | 478 | 5 | 478 |
| 12/7/2010 | 19:17:45 | 7:08 | Incoming Call | | 2155261796 | Answered | | 2675884100 | Philadelphia | 5 | 478 | 6 | 466 |
| 12/7/2010 | 19:26:22 | 0:21 | Incoming Call | | 2155261796 | Answered | | 2673079391 | Philadelphia | 3 | 491 | 6 | 466 |
| 12/7/2010 | 19:46:59 | 2:58 | Outgoing Call | 2673079391 | 2673079391 | Answered | | | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 20:30:35 | 0:25 | Outgoing Call | 2157584584 | 2157584584 | Answered | None | | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 21:06:16 | 1:01 | Outgoing Call | 2676945824 | 2676945824 | Answered | | | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 21:17:35 | 0:20 | Outgoing Call | 2159105030 | 2159105030 | Answered | | | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 21:28:23 | 2:55 | Incoming Call | | 2155261796 | Answered | | 2673079391 | Philadelphia | 5 | 491 | 6 | 466 |
| 12/7/2010 | 21:31:36 | 0:30 | Incoming Call | | 2155261796 | Answered | | 2675884100 | Philadelphia | 5 | 491 | 5 | 491 |
| 12/7/2010 | 21:42:17 | 1:28 | Incoming Call | | 2155261796 | Answered | | 2675884100 | Philadelphia | 5 | 491 | 5 | 491 |
| 12/7/2010 | 21:43:55 | 0:46 | Outgoing Call | 2152841429 | 2152841429 | Answered | | | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 21:57:14 | 0:50 | Incoming Call | | 2155261796 | Answered | | 2154001381 | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 22:02:11 | 0:35 | Outgoing Call | 2152841429 | 2152841429 | Answered | | | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 22:07:51 | 0:36 | Incoming Call | | 2155261796 | Answered | | 2152841429 | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 22:09:04 | 0:21 | Outgoing Call | 2675884100 | 2675884100 | Answered | | | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 22:19:20 | 0:12 | Outgoing Call | 2676027258 | 2676027258 | Not Answered | | | Philadelphia | 5 | 466 | 5 | 466 |
| 12/7/2010 | 22:26:32 | 0:25 | Incoming Call | | 2155261796 | Not Answered | | 2154001381 | Philadelphia | 6 | 466 | 6 | 466 |
| 12/7/2010 | 22:57:47 | 0:36 | Incoming Call | | 2155261796 | Answered | | 2154001381 | Philadelphia | 5 | 466 | 5 | 466 |
| 12/8/2010 | 00:34:32 | 0:39 | Outgoing Call | 2673333317 | 2673333317 | Answered | None | | Philadelphia | 3 | 491 | 3 | 491 |
| 12/8/2010 | 01:23:23 | 0:13 | Incoming Call | | 2155261796 | Not Answered | None | 2677700434 | Philadelphia | 1 | 492 | 1 | 492 |
| 12/8/2010 | 01:23:43 | 0:23 | Outgoing Call | 2677700434 | 2677700434 | Answered | None | | Philadelphia | 3 | 486 | 3 | 486 |
| 12/8/2010 | 09:02:43 | 0:09 | Incoming Call | 7612155261796 | 2155261796 | Answered | Call FWD - No Reply | 2673079391 | Philadelphia | 3 | 486 | 3 | 486 |
| 12/8/2010 | 09:05:11 | 0:03 | Incoming Call | 7612155261796 | 2155261796 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | 3 | 486 | 3 | 486 |
| 12/8/2010 | 09:29:36 | 0:33 | Outgoing Call | 2673079391 | 2673079391 | Answered | | | Philadelphia | 3 | 488 | 3 | 486 |
| 12/8/2010 | 09:30:42 | 0:11 | Outgoing Call | 2675884100 | 2675884100 | Not Answered | | | Philadelphia | 3 | 486 | 3 | 486 |
| 12/8/2010 | 09:34:25 | 0:47 | Outgoing Call | 2673079391 | 2673079391 | Answered | | | Philadelphia | 1 | 492 | 1 | 492 |
| 12/8/2010 | 09:34:28 | 6:13 | Outgoing Call | 2673079391 | 2673079391 | Answered | | | Philadelphia | 3 | 486 | 1 | 492 |
| 12/8/2010 | 10:06:50 | 4:51 | Incoming Call | | 2155261796 | Answered | | 2673079391 | Philadelphia | 3 | 492 | 6 | 466 |
| 12/8/2010 | 10:40:16 | 0:24 | Outgoing Call | 2152841429 | 2152841429 | Answered | | | Philadelphia | 6 | 466 | 6 | 466 |

# metroPCS.

Call Details



| Date | Time | Dur | Type | Number | Number | Status | Note | Fwd Number | Location | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Search Number: 2155261798 Search Dates: 12/7/2010 - 12/8/2010** | | | | | | | | | |
| 12/8/2010 | 10:55:18 | 0:20 | Outgoing Call | 2152844420 | 2152844420 | Answered | | | Philadelphia | 3 | 491 | 3 | 491 |
| 12/8/2010 | 11:26:22 | 6:21 | Outgoing Call | 2156471603 | 2156471603 | Answered | | | Philadelphia | 5 | 486 | 6 | 486 |
| 12/8/2010 | 11:38:27 | 0:07 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 11:50:50 | 0:24 | Outgoing Call | 2156471603 | 2156471603 | Answered | | | Philadelphia | 2 | 492 | 2 | 492 |
| 12/8/2010 | 11:56:02 | 0:16 | Outgoing Call | 2156471603 | 2156471603 | Answered | | | Philadelphia | 2 | 492 | 2 | 492 |
| 12/8/2010 | 11:56:52 | 0:12 | Incoming Call | | 2155261798 | Answered | | 2156471603 | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 12:02:09 | 0:25 | Incoming Call | | 2155261798 | Answered | | 2675504615 | Philadelphia | 3 | 486 | 3 | 486 |
| 12/8/2010 | 12:45:30 | 1:22 | Outgoing Call | 2159105030 | 2159105030 | Answered | | | Philadelphia | 5 | 486 | 5 | 486 |
| 12/8/2010 | 12:52:12 | 2:41 | Outgoing Call | 2156471603 | 2156471603 | Answered | | | Philadelphia | 5 | 486 | 5 | 486 |
| 12/8/2010 | 12:56:33 | 1:04 | Outgoing Call | 2156471603 | 2156471603 | Answered | | | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 13:03:04 | 1:34 | Outgoing Call | 2153915839 | 2153915839 | Answered | | | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 13:12:03 | 0:30 | Outgoing Call | 2154293023 | 2154293023 | Answered | | | Philadelphia | 5 | 486 | 5 | 486 |
| 12/8/2010 | 13:39:45 | 0:58 | Incoming Call | | 2155261798 | Answered | | | Philadelphia | 5 | 486 | 5 | 486 |
| 12/8/2010 | 13:44:33 | 1:04 | Outgoing Call | 2673407706 | 2673407706 | Answered | | | Philadelphia | 5 | 486 | 5 | 486 |
| 12/8/2010 | 13:50:11 | 0:19 | Incoming Call | | 2155261798 | Not Answered | | 2154001381 | Philadelphia | 5 | 486 | 5 | 486 |
| 12/8/2010 | 13:57:32 | 2:00 | Outgoing Call | 2156471603 | 2156471603 | Answered | | | Philadelphia | 5 | 486 | 5 | 486 |
| 12/8/2010 | 14:03:51 | 0:16 | Outgoing Call | 2673407706 | 2673407706 | Answered | | | Philadelphia | 5 | 486 | 5 | 486 |
| 12/8/2010 | 14:04:54 | 11:11 | Outgoing Call | 2152844420 | 2152844420 | Answered | | | Philadelphia | 5 | 486 | 6 | 486 |
| 12/8/2010 | 14:22:39 | 0:20 | Outgoing Call | 2159105030 | 2159105030 | Answered | | | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 14:24:33 | 0:21 | Outgoing Call | 2159105030 | 2159105030 | Answered | | | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 14:38:13 | 0:39 | Incoming Call | | 2155261798 | Answered | | 2673079391 | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 14:45:56 | 0:43 | Outgoing Call | *672152350496 | 2152350496 | Answered | | | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 14:50:59 | 0:42 | Outgoing Call | 2676195659 | 2676195659 | Answered | None | | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 15:17:15 | 0:05 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2673333317 | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 15:26:58 | 0:05 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2156471603 | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 15:29:06 | 0:07 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2155547042 | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 15:34:44 | 0:05 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2675545160 | Philadelphia | 6 | 486 | 6 | 486 |
| 12/8/2010 | 16:39:33 | 0:06 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2675545160 | Philadelphia | | | | |
| 12/8/2010 | 16:39:43 | 0:04 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2675545160 | Philadelphia | | | | |
| 12/8/2010 | 16:39:52 | 0:04 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2675545160 | Philadelphia | | | | |
| 12/8/2010 | 16:51:32 | 0:04 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | | |
| 12/8/2010 | 16:51:51 | 0:04 | Incoming Call | 78+2155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | | |
| 12/8/2010 | 16:52:01 | 0:05 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | | |
| 12/8/2010 | 16:52:11 | 0:04 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | | |
| 12/8/2010 | 16:58:50 | 0:05 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2675545160 | Philadelphia | | | | |
| 12/8/2010 | 16:01:56 | 0:06 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | | |
| 12/8/2010 | 16:02:10 | 0:05 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | | |
| 12/8/2010 | 16:02:30 | 0:04 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | | |
| 12/8/2010 | 16:17:16 | 0:04 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2675545160 | Philadelphia | | | | |
| 12/8/2010 | 16:23:08 | 0:09 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2679713604 | Philadelphia | | | | |
| 12/8/2010 | 16:23:21 | 0:12 | Incoming Call | 7612155261798 | 2155261798 | Answered | Call FWD - No Reply | 2679713604 | Philadelphia | | | | |

Records for Target Number: 2155261798

Call Details

# metroPCS.



**Search Number: 2155261798 Search Dates: 12/7/2010 - 12/8/2010**

| Date | Time | Dur | Type | From | To | Status | Reason | Number | City | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/8/2010 | 16.23.40 | 0:33 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2679713604 | Philadelphia | | | |
| 12/8/2010 | 16.32.15 | 0:07 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2675845160 | Philadelphia | | | |
| 12/8/2010 | 17.27.11 | 0:03 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/8/2010 | 18.18.58 | 0:10 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2155310694 | Philadelphia | | | |
| 12/8/2010 | 18.19.53 | 0:09 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154325595 | Philadelphia | | | |
| 12/8/2010 | 18:20.23 | 0:05 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154325595 | Philadelphia | | | |
| 12/8/2010 | 20.29.23 | 0:12 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/8/2010 | 20.29.57 | 0:07 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/8/2010 | 20.36.04 | 0:07 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/8/2010 | 20.37.14 | 0:05 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/8/2010 | 20.39.12 | 0:09 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2673079391 | Philadelphia | | | |
| 12/8/2010 | 20.39.32 | 0:04 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2673079391 | Philadelphia | | | |
| 12/8/2010 | 20.40.22 | 0:04 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2673079391 | Philadelphia | | | |
| 12/8/2010 | 20.49.12 | 0:04 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/8/2010 | 20.55.11 | 0:04 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2673079391 | Philadelphia | | | |
| 12/8/2010 | 21.01.48 | 0:06 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/8/2010 | 21.28.27 | 0:07 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2675078652 | Philadelphia | | | |
| 12/8/2010 | 22.04.49 | 0:07 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154103312 | Philadelphia | | | |
| 12/8/2010 | 22.28.54 | 0:04 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2159080097 | Philadelphia | | | |
| 12/8/2010 | 22.34.04 | 0:09 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2153915899 | Philadelphia | | | |
| 12/8/2010 | 22.44.17 | 0:06 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2159080097 | Philadelphia | | | |
| 12/8/2010 | 23.30.49 | 0:06 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2672968014 | Philadelphia | | | |
| 12/8/2010 | 23.31.01 | 0:07 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2672968014 | Philadelphia | | | |
| 12/8/2010 | 23.41.11 | 0:06 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/8/2010 | 23.44.12 | 0:02 | Incoming Call | 7812155261798 | 2155261798 | Not Answered | Call FWD - No Reply | 2155471603 | Philadelphia | | | |
| 12/8/2010 | 23.54.03 | 0:06 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/8/2010 | 23.54.23 | 0:08 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 00.05.11 | 0:05 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 00.12.26 | 0:05 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 00.18.16 | 0:03 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 00.34.26 | 0:06 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 01.20.31 | 0:06 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 01.42.34 | 0:04 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 01.48.28 | 0:03 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 02.08.15 | 0:06 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 07.21.43 | 0:03 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 07.53.47 | 0:05 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154325595 | Philadelphia | | | |
| 12/9/2010 | 08.20.11 | 0:04 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 08.40.15 | 0:39 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2155310694 | Philadelphia | | | |
| 12/9/2010 | 09.15.32 | 0:03 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |
| 12/9/2010 | 09.27.13 | 0:04 | Incoming Call | 7812155261798 | 2155261798 | Answered | Call FWD - No Reply | 2154001381 | Philadelphia | | | |

# First Judicial District of Pennsylvania

*51CR00094622011*
*Darryl Rigney*

*Guilty Plea Volume 1*
*May 20, 2013*



*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File 52013^Sarmina.txt  75 Pages*
*CRS Catalog ID  13090184*



51CR00094622011
Darryl Rigney

Page 1

[1]      IN THE COURT OF COMMON PLEAS
[2]   FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
[3]         CRIMINAL TRIAL DIVISION
[4]            - - -
[5] COMMONWEALTH      . CP-51-CR-0009462-2011

[6]   vs      :

[7] DARRYL RIGNEY
[8]
[9]            - - -
[10]       May 20, 2013
[11]            - - -
[12]
[13]       Room 507 Criminal Justice Center
[14]         Philadelphia, Pennsylvania
[15]            Guilty Plea
[16]
[17]            - - -
[18] BEFORE: THE HONORABLE M. TERESA SARMINA, J
[19]
[20]
[21]
[22]
[23]
[24]
[25]
      Megan Soule, RMR, CRR  (215) 683-8029

Page 2

[1] APPEARANCES:
[2]   RICHARD SAX, ESQUIRE
      Assistant District Attorney
[3]   for the Commonwealth
[4]
      JOSEPH SANTAGUIDA, ESQUIRE
[5]   Attorney for Defendant
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
           Megan Soule, RMR, CRR  (215) 683-8029

Page 3

[1]         I N D E X
[2]
[3] COMMONWEALTH'S EVIDENCE      DR  CR  RDR  RCR
[4] (None presented.)
[5]
    DEFENDANT'S EVIDENCE
[6]
    (None presented.)
[7]
[8]
         E X H I B I T S
[9]
[10] NO.   DESCRIPTION     IDENT.  EVID
[11]
    (None marked at this time )
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
      Megan Soule, RMR, CRR  (215) 683-8029

Page 4

[1]        THE COURT·  So what is the offer?
[2]   We're switching gears now to Mr. Rigney.
[3]        MR. SAX:  Two counts of third-degree
[4]   murder  We would waive the automatic life
[5]   sentence  Two counts of robbery and one count
[6]   of conspiracy.
[7]        THE COURT·  And he has to testify
[8]   against the co-defendants?
[9]        MR. SAX.  And he has to testify against
[10]  Montez Bethea
[11]        THE COURT  When were you going to tell
[12]  me that?
[13]        MR. SAX  Well, I'm not even telling
[14]  you that, Your Honor, until he tells us that.
[15]  I mean, that's always been a possibility.
[16]        THE COURT  Well, I kind of feel like
[17]  why is this being done on the day we're picking
[18]  the jury?
[19]        MR. SAX.  It's not my client  Okay
[20]        MR. SANTAGUIDA  Judge, he never
[21]  suggested that he was going to cooperate,
[22]  never, until Saturday or Friday, whenever I
[23]  went up there.
[24]        THE COURT  And what happened then?
[25]        MR. SANTAGUIDA  The first thing when I
           Megan Soule, RMR, CRR  (215) 683-8029



Page 5

[1] went to see him, he said, they make an offer?
[2] They make an offer? I said yeah. I don't
[3] think you're going to be too happy with it. I
[4] said 20-to-40. He said, you know, I'll
[5] cooperate. I said you never said that. Oh,
[6] yeah. Oh, yeah. Okay. So that was the first
[7] I knew about it.
[8]     THE COURT: All right. Well, we're
[9] going to do a full colloquy, because if he ends
[10] up deciding not to testify, he's still going to
[11] get the two thirds and whatever else. I don't
[12] know what. And maybe he's going to have to
[13] allocute here about what it is that he's going
[14] to be testifying to.
[15]     MR. SANTAGUIDA: Sure. He gave a
[16] statement. The statement he gave he said they
[17] went to buy marijuana, three guys. He was the
[18] driver. They went inside. He said he didn't
[19] hear any shots, but when they came out they
[20] came out with a big duffle bag so he knew they
[21] didn't go buy two ounces because they came out
[22] with a big duffle bag. They jumped in the car
[23] and they said go, go, go, go, go. So he went
[24] to, like, a safe house.
[25]     They all got out. They went inside the

Page 6

[1] safe house and the cops just happened to see
[2] them and arrested them there.
[3]     MR. SAX: It wasn't so safe.
[4]     MR. SANTAGUIDA: Right.
[5]     MR. SAX: Your Honor, can I hand the
[6] Court his statement?
[7]     THE COURT: You can let whoever the
[8] officers are that are out there just trying to
[9] come in know that they're free to come in now.
[10]     MR. SAX: Thank you. And I don't
[11] really disagree with Mr. Santaguida's
[12] recitation. The interpretation of what he says
[13] to the detectives is quite different from our
[14] perspective, should we have gone to trial.
[15] But, yes.
[16]     THE COURT: So what is it that he's
[17] going to be testifying to against the other
[18] two?
[19]     MR. SAX: To everything that he said in
[20] his statement plus, if this is to go down, then
[21] he would have to admit that he knew it was
[22] going to be a robbery ahead of time. I'm not
[23] having him plead guilty or agreeing that he
[24] should plead guilty to a robbery and a
[25] conspiracy and the resultant murders that

Megan Soule, RMR, CRR  (215) 683-8029

Page 7

[1] occurred unless he concedes and admits that he
[2] knew it was going to be a robbery.
[3]     THE COURT: That what?
[4]     MR. SAX: That he knew it was going to
[5] be a robbery. He waited around afterwards. He
[6] drove them afterwards. He waited for his cut.
[7]     MR. SANTAGUIDA: I don't think he's
[8] going to say that.
[9]     MR. SAX: Well, then he can't plead
[10] guilty. Why would he plead guilty if he's not
[11] admitting that he was involved in the robbery?
[12] But the thing is that he would have to say
[13] that, or else I don't find him to be credible
[14] and I would have a hard time presenting him as
[15] a witness in the two shooters' cases if he's
[16] not credible. So let me hand this up to the
[17] Court, to Mr. Brechemin.
[18]     THE COURT: All right. So it sounds
[19] like we might be picking a jury after all.
[20]     MR. SANTAGUIDA: I offered to waive.
[21] They said no.
[22]     MR. SAX: May I address the Court?
[23]     THE COURT: You may.
[24]     MR. SAX: On just the issues we were
[25] talking about, so I prepared a proffer letter,

Megan Soule, RMR, CRR  (215) 683-8029

Page 8

[1] a standard proffer letter and also a Memorandum
[2] of Agreement detailing some of the things that
[3] we mentioned. And so one of the things that
[4] sometimes happens is pursuant to the proffer
[5] letter there would be a statement taken. Now
[6] this statement again is 98 percent of what we
[7] believe the truth is.
[8]     THE COURT: Which may or may not be the
[9] actual truth, but whatever.
[10]     MR. SAX: Most likely what I would have
[11] sought at this time, if he enters into a guilty
[12] plea, or if that's his intention, is to have
[13] him -- if true -- adopt the statement and then
[14] be asked a question or two in addition. Is
[15] there anything you want to change and/or
[16] correct? And if it's true that he knew it was
[17] going to be a robbery, as all indications are,
[18] then that would be the addition or the
[19] amendment.
[20]     I think that it might not be necessary
[21] in terms of economics of time. If we do
[22] exactly what the Court had suggested, which
[23] perhaps in a very complete and full colloquy
[24] include under oath that aspect of the amendment
[25] to his statement, which can be done by Mr.

Megan Soule, RMR, CRR  (215) 683-8029

RR 28

51CR00094622011
Darryl Rigney

Page 9

[1] Santaguida, the Court, Your Honor, or myself,
[2] probably best after having Mr Santaguida
[3] discuss this with him at some point. So that
[4] would eliminate the necessity, perhaps, of any
[5] delay this morning taking him over somewhere or
[6] having him do a second statement, if he's going
[7] to under oath adopt that
[8]      THE COURT. If you're having him
[9] testify against the other two guys, why does he
[10] have to admit that, if they're the ones that
[11] went in and did whatever they did? I assume
[12] they took this stuff and killed two people
[13] there, is that what it was?
[14]      MR. SAX: Yes. Brutally  Why would I
[15] want anyone to plead guilty if they weren't
[16] guilty of a robbery and a conspiracy?
[17]      THE COURT. Okay.  Let's have him out
[18]      (The defendant enters the courtroom at
[19] this time )
[20]      THE COURT  And the offer was for
[21] 20-to-40 two counts of third, waiving
[22] mandatory life, and two counts of robbery.
[23]      MR. SAX. And conspiracy  The trial,
[24] Your Honor, is listed in September before Judge
[25] Bronson. I think that's September the -- first.

Megan Soule, RMR, CRR (215) 683-8029

Page 10

[1] Monday in September, I believe
[2]      THE COURT. So Mr. Rigney -- did you
[3] want to talk to him in the booth, Mr
[4] Santaguida?
[5]      MR. SANTAGUIDA  I can talk to him
[6] here
[7]      MR. SAX·  Second Monday, September 9th.
[8]      MR. SANTAGUIDA  Judge, he's never
[9] going to say that he knew they were going to
[10] rob the person, so let's pick a jury
[11]      THE COURT  Okay
[12]      MR. SANTAGUIDA. He would be lying to
[13] say that.
[14]      THE COURT. Well, I still want to do a
[15] colloquy --
[16]      MR. SANTAGUIDA: Certainly
[17]      THE COURT: -- so that later there's no
[18] questions about that.
[19]      And what was offered, as I understand
[20] it -- could he be sworn in, please?
[21]      THE COURT CRIER. Yes, Your Honor
[22] Sir, state your full name, spell your
[23] last name for the record
[24]      THE DEFENDANT.  Darryl Rigney,
[25] R-I-G-N-E-Y.

Megan Soule, RMR, CRR  (215) 683-8029

Page 11

[1]      - - -
[2]      DARRYL RIGNEY, after having been duly
[3] sworn, was examined and testified as
[4] follows.
[5]      THE COURT  Good morning, Mr. Rigney.
[6] We're here to pick the jury for your case, and
[7] before we start jury selection I guess I'm
[8] going to conduct a colloquy, a discussion with
[9] you about the offer that was made.  And that
[10] was an offer of 20-to-40 years incarceration
[11] and the District Attorney's Office would waive
[12] the mandatory life sentence
[13]      If you're found guilty of even two
[14] counts of third-degree murder, then it is a
[15] mandatory life sentence, two counts of robbery
[16] and one count of criminal conspiracy, and that
[17] you would have to testify against the other two
[18] individuals, Montez and Rashon  Am I correct
[19] on those names?
[20]      MR. SAX:  You are. Montez Bethea,
[21] Rashon James  And we would also not be
[22] proceeding on second-degree murder, which this
[23] case very much is from our perspective
[24]      THE COURT: And the second-degree
[25] murder that Mr Sax just mentioned, both

Megan Soule, RMR, CRR  (215) 683-8029

Page 12

[1] first-degree murder and second-degree murder
[2] carry a mandatory life sentence, and for
[3] second-degree murder --
[4]      MR. SANTAGUIDA:  There's no first
[5] First was quashed.
[6]      THE COURT:  It was?
[7]      MR. SAX.  Only for him, yes
[8]      THE COURT  Only for you
[9]      MR. SAX:  By concession
[10]      THE COURT  Thank you for that
[11] clarification.
[12]      So you're facing -- right now, for
[13] trial, you're facing second-degree murder,
[14] third-degree murder, I guess, and the robbery
[15] charges, et cetera.  And so the District
[16] Attorney's Office is willing to offer you the
[17] 20-to-40 for two counts of third-degree murder
[18] under the circumstances I've already described,
[19] but I guess their point is that -- or their
[20] perspective is that you knew it was going to be
[21] a robbery  And so they're not willing to have
[22] you go and testify against the other two guys
[23] if you didn't know it was going to be a
[24] robbery.  And so do you understand what the
[25] offer is?

Megan Soule, RMR, CRR  (215) 683-8029

RR23

51CR00094622011
Darryl Rigney

Page 13

[1]      THE DEFENDANT   Yes, I do
[2]      THE COURT   And so you're saying --
[3]   you've said to your attorney and you're saying
[4]   to the Court that you did not know that it was
[5]   going to be a robbery?
[6]      THE DEFENDANT   Yes, I said that.
[7]      THE COURT:   And so what you're saying
[8]   is that -- and I haven't gotten through the
[9]   entire statement, which Mr Sax handed up a
[10]   couple of minutes ago -- you thought you were
[11]   doing what?
[12]      THE DEFENDANT   Just taking my friends
[13]   to go buy some marijuana, two ounces of
[14]   marijuana.
[15]      THE COURT   Yes, go ahead.
[16]      MR. SAX:   Certainly I don't mind
[17]   playing my hand, so to speak, to Mr.
[18]   Santaguida, but if the Court wanted to --
[19]      THE COURT·   Mr. Santaguida, are you
[20]   listening?  I know you can't listen to both
[21]   persons.  Maybe you're better than me.  I can't
[22]   listen to two people at one time.  I'm sure
[23]   you're better than me.
[24]      MR. SANTAGUIDA:   No, I'm not.  Go
[25]   ahead.

Megan Soule, RMR, CRR  (215) 683-8029

Page 14

[1]      MR. SAX   So what we'll be arguing to
[2]   the jury in terms of the circumstances of what
[3]   happened beforehand, they switched cars, they
[4]   he had a -- they pulled up in a purple Mercury,
[5]   I think, and they switched into a white
[6]   Cadillac and he stayed around for all the
[7]   proceeds being divvied up  And so all these
[8]   things would be our argument relative to why he
[9]   knew that it was more than a couple of ounces
[10]   of weed being purchased in a friendly kind of
[11]   situation
[12]      I understand if Mr Rigney doesn't want
[13]   to concede that.  That's why we have jury
[14]   trials  And I'm sure he's thought about all
[15]   that  But since the Court was having a little
[16]   bit of a colloquy with the defendant, I offered
[17]   that perspective  And, of course, the
[18]   switching of the cars was before they went to
[19]   the scene
[20]      THE COURT   I did get that far
[21]   Anything else, Mr. Santaguida?
[22]      MR. SANTAGUIDA   No  The significance
[23]   of switching cars, I mean, what's the
[24]   difference?  If you're using a blue car or a
[25]   red car, what's the difference?  It's not like

Megan Soule, RMR, CRR  (215) 683-8029

Page 15

[1]   they switched cars after the incident and
[2]   somebody made an identification of blue so
[3]   let's switch to a red car  This is before the
[4]   incident even happened, so what's the
[5]   difference if they say the person that did this
[6]   or that is driving a red car, or if they were
[7]   driving a blue car?  What difference does it
[8]   make?  They're all hung up on the switching of
[9]   the cars  I see no significance of that at
[10]   all.  But all right
[11]      MR. SAX.   There is a big significance.
[12]   I will save that for my closing argument.
[13]      MR. SANTAGUIDA.   Okay
[14]      MR. SAX.   Especially as it relates to
[15]   Mr Rigney.
[16]      THE COURT   Do you have cell phone
[17]   information that you're going to be using in
[18]   the trial, Mr. Sax?
[19]      MR. SAX:   Yes.
[20]      MR. SANTAGUIDA:   I don't know why.  We
[21]   agree to everything.  We agree that he was
[22]   there  We agree he drove here.  We agree he
[23]   drove to the, quote, safe house  So let them
[24]   use it.
[25]      MR. SAX:   We also -- and I know Mr.

Megan Soule, RMR, CRR  (215) 683-8029

Page 16

[1]   Santaguida probably shared this with the
[2]   defendant.  We just this Saturday received
[3]   another statement.  Actually, it has an address
[4]   on there so just for purposes of --
[5]      THE COURT.   This is a statement from
[6]   whom?
[7]      MR. SAX.   From someone who shared
[8]   accommodations with Mr. Rigney in the last two
[9]   years where he admits to being the lookout.
[10]   I'm just going to hand him the entire statement
[11]   except for the top, and I'll give him the
[12]   original, but just for now
[13]      THE COURT.   Okay  Did you want to
[14]   review that with your client in the booth?
[15]      MR. SANTAGUIDA   I can do it here
[16]      THE COURT   Okay  Whatever you want
[17]   Why do we have ten police witnesses
[18]   here on a day that we're merely picking the
[19]   jury?
[20]      MR. SAX.   Well, Your Honor, a whole
[21]   bunch of reasons, one of which is when we're
[22]   actually presenting the case to the jury, I
[23]   don't have the time or opportunity to prepare
[24]   them for their testimony  And although it's
[25]   straight forward in its facts, the presentation

Megan Soule, RMR, CRR  (215) 683-8029

RR 24

S1CR00094622011
Darryl Rigney

Page 17

[1] can be difficult  And especially when the safe
[2] house that the defendant drove his two
[3] co-conspirators to was anything but a safe
[4] house with all you-know-what breaking loose.
[5] It's important for me to make sure that
[6] everyone is ready to testify clearly and
[7] accurately to all the facts  So I needed that
[8] opportunity to discuss that with them, give
[9] them the notes of testimony from the prelim
[10] All that kind of stuff
[11]        **THE COURT**  Let me address another
[12] matter briefly.
[13]        (The court heard another matter at
[14]        this time.)
[15]        **THE COURT**  Mr Rigney, whatever you
[16] say here in open court when you are under oath,
[17] you are bound by the answers that you give me,
[18] which means that you are stuck with those
[19] answers for the rest of your life. Do you
[20] understand that?
[21]        **THE DEFENDANT:** Yes
[22]        **THE COURT.** And so I don't want you
[23] answering something in a particular way because
[24] Mr. Santaguida told you to say it or anybody
[25] else told you to say it, because if you do say

Megan Soule, RMR, CRR  (215) 683-8029

Page 18

[1] it, you're going to be stuck with that.  You
[2] can't come back later and say, well, he told me
[3] to answer that way, because nobody is going to
[4] buy it  I'm the judge. This is an open
[5] courtroom and this is the one time that if
[6] you're going to tell the truth, it better be
[7] it, because if there's any understanding, if
[8] there's any promises, if there's any threats,
[9] this is the only time you get to let someone
[10] know  Do you understand that?
[11]        **THE DEFENDANT:** Yes
[12]        **THE COURT**  If I say something you
[13] don't understand, just ask and I can explain it
[14] a different way. I'm happy to do that
[15]        **THE DEFENDANT:** All right
[16]        **THE COURT.** And so you were arrested on
[17] December the 9th of 2010?
[18]        **THE DEFENDANT:** December 8th
[19]        **THE COURT**  December 8th. And so there
[20] is a statement taken from you the next day, the
[21] next afternoon?
[22]        **THE DEFENDANT.** Yes.
[23]        **THE COURT·** Okay. And what you told
[24] the detectives, was that the truth?
[25]        **THE DEFENDANT:** Yes.

Megan Soule, RMR, CRR  (215) 683-8029

Page 19

[1]        **THE COURT:** So if you're not saying
[2] that it was going to be a robbery, but you're
[3] saying that this is what you said to the
[4] detectives, are you willing to testify to that
[5] in front of a jury -- which I think would take
[6] place in September -- where Rashon and Montez
[7] would be sitting where you're sitting right now
[8] and you would be testifying up here?  Are you
[9] prepared to do that?
[10]        **THE DEFENDANT:** Yes.
[11]        **THE COURT.** All right. And so then
[12] you're willing to plead guilty? You don't have
[13] to, Mr Rigney. I want you to know it's not an
[14] easy decision. I do understand that. I've
[15] never been in your seat, but I understand that
[16] it's a very difficult decision to make  I
[17] don't care which way you decide  If you want a
[18] jury trial, we have 60 people in another room
[19] waiting to be brought over. We have their
[20] paperwork here. We're ready to hand it out to
[21] the attorneys so that you guys can begin
[22] picking the jury that will decide the case
[23]        You know what you're facing. What
[24] you're facing, if you're found guilty -- and
[25] I'm not saying you will be.  I don't know  But

Megan Soule, RMR, CRR  (215) 683-8029

Page 20

[1] the evidence is there  The prosecutor is going
[2] to argue that this was a murder/robbery, a
[3] felony murder, second-degree murder.
[4] Second-degree murder carries a mandatory life
[5] sentence.  I don't know if the jury is going to
[6] find you guilty. I don't know if they're going
[7] to find you not guilty. You don't know that
[8] either. You've seen the discovery with your
[9] attorney, all the materials that were turned
[10] over by the police, and you've discussed it
[11] with your attorney; is that correct?
[12]        **THE DEFENDANT.** Yes.
[13]        **THE COURT.** And so you have to try to
[14] make the decision that you think you can live
[15] with  So if you want to go to trial, we'll go
[16] to trial. And if the jury finds you guilty of
[17] second-degree murder, I will have no choice but
[18] to sentence you to a mandatory life sentence,
[19] because that's what the legislature has set
[20] forth. And if you want to go to trial, that's
[21] your absolute right to do and we will proceed
[22] with the trial  It's your decision
[23]        There are three, sometimes four
[24] decisions that are for you, the accused, to
[25] make  Your attorney does not get to make those

Megan Soule, RMR, CRR  (215) 683-8029

RR 25

51CR00094622011
Darryl Rigney

Page 21

[1] decisions  The first one is the one we're
[2] talking about right now, whether you wish to
[3] plead guilty or go to trial. When I say wish,
[4] it's not like I think that's what you're
[5] wishing for, but whether you're making the
[6] choice to plead guilty or go to trial. And
[7] that's your absolute right  You don't have an
[8] absolute right to plead guilty, okay, unless
[9] you're pleading to the most serious charges
[10] that there are  Obviously, you're not doing
[11] that
[12]      So there's been an offer made, and if
[13] you decide to accept it, then you have -- if I
[14] did not wish to accept it, then we would go
[15] ahead and go to trial. All right?
[16]      THE DEFENDANT. Yes.
[17]      THE COURT  You do have an absolute
[18] right to have a trial in this case, and at that
[19] trial you would be presumed innocent of the
[20] charges that were filed against you and it
[21] would be the prosecutor's job, Mr Sax in this
[22] case, to prove your guilt beyond a reasonable
[23] doubt. And so that's the first decision that
[24] is for you alone to make. Like I said, your
[25] attorney does not get to make that decision,

Megan Soule, RMR, CRR  (215) 683-8029

Page 22

[1] only you do
[2]      The second decision that is for you
[3] alone to make is whether you wish to have a
[4] judge only trial or a trial with a jury  If
[5] it's a judge only trial, the judge decides the
[6] facts and the law and that's the end of it  If
[7] it's a jury trial, the judge still decides the
[8] law, but the jury decides the facts  They
[9] decide who do they believe, how important the
[10] testimony is, who they don't believe, what are
[11] the facts of what happened in the case  And
[12] the jury would have to be unanimous before
[13] there could be a verdict of guilty or a verdict
[14] of not guilty  Before there could be any kind
[15] of a verdict, the jury, all 12, would have to
[16] agree.
[17]      MR. SANTAGUIDA  Judge, before you go
[18] any further, I just wanted you to know his
[19] statement is in front of him so he can review
[20] it and make a decision
[21]      THE COURT·  Thank you
[22]      The last decision that is for you alone
[23] to make, regardless of what kind of trial you
[24] have, is whether you wish to testify or you
[25] wish not to testify in the case. And then the

Megan Soule, RMR, CRR  (215) 683-8029

Page 23

[1] last decision is if you're found guilty,
[2] whether you wish to take an appeal or not.
[3]      So those are the three or sometimes
[4] four decisions that are for you alone to make,
[5] and that's partly because you have to live with
[6] the consequences of them. Nobody wants to
[7] say -- have your attorney say, no, don't
[8] testify, I'm not letting you testify  And then
[9] you say, oh, I should have testified, I should
[10] have testified, if the jury finds you guilty.
[11] Okay
[12]      Of course, if the jury finds you not
[13] guilty, then whatever decision you make, you're
[14] thinking you're all happy with it
[15]      But those four decisions are for you
[16] alone to make, obviously with the advice of
[17] your attorney, who is extremely experienced and
[18] knowledgeable and whose advice you should take
[19] into account. But ultimately you have to make
[20] the decision. Do you understand all of that?
[21]      THE DEFENDANT. Yes
[22]      THE COURT. Is there anything I've said
[23] that you don't understand?
[24]      THE DEFENDANT: No.
[25]      THE COURT  Okay  Do you have any

Megan Soule, RMR, CRR  (215) 683-8029

Page 24

[1] questions for me right now?
[2]      THE DEFENDANT. No.
[3]      THE COURT: So do you want to read back
[4] through your statement of what you said to the
[5] detective?  Do you want me to read it to you?
[6]      THE DEFENDANT: I basically know what I
[7] said.
[8]      THE COURT: Okay. So I'm not saying
[9] that it's easy to testify against people that
[10] you know. I'm not suggesting that
[11]      MR. SANTAGUIDA·  I don't think he has a
[12] problem with that
[13]      THE COURT·  Well, then what's he having
[14] a problem with?
[15]      MR. SANTAGUIDA: He would like to talk
[16] it over with his family.
[17]      THE COURT: You can do that.  I think
[18] we'll probably need a short from Miss Corbett
[19] next door so that the sheriff can allow them to
[20] speak to him in the booth. If you would put
[21] him in the booth. As soon as we sign
[22] something, Mr. Rigney, for the sheriff to be
[23] allowed to let your family in.  Usually the
[24] attorney is permitted to meet with you, but for
[25] the family to be allowed to discuss it with

Megan Soule, RMR, CRR  (215) 683-8029



51CR00094622011                                              Guilty Plea Volume 1
Darryl Rigney                                                    May 20, 2013

Page 25

[1] you, I have to sign something giving the
[2] sheriff authorization to do that. Okay?
[3]     THE DEFENDANT: Thank you
[4]     (A short recess occurred.)
[5]     THE COURT: Have you reviewed that
[6] Memorandum of Understanding with him? You'll
[7] probably need to at some point during this
[8] colloquy
[9]     MR. SANTAGUIDA: I think it's
[10] different. That memorandum says he knew about
[11] the robbery
[12]     MR. SAX: Does it? No.
[13]     THE COURT: Make sure it doesn't. Or
[14] if it does, then cross it out and initial it
[15]     MR. SAX: In the interest of getting
[16] this done, we've knocked off one year, so it's
[17] 19-to-38 as opposed to 20-to-40. I'll change
[18] that and initial it.
[19]     THE COURT: Okay. Do I have a copy of
[20] the Memorandum of Understanding?
[21]     MR. SAX: If you don't, you will now,
[22] Your Honor. Your Honor, I'll pass you a copy.
[23] I'm going to change it, reflecting the one to
[24] two less.
[25]     THE COURT: Are you all right, Mr.
        Megan Soule, RMR, CRR  (215) 683-8029

Page 26

[1] Rigney?
[2]     THE DEFENDANT: Yes
[3]     THE COURT: You're still under oath
[4]     THE DEFENDANT: Yes
[5]     THE COURT: Which means that you're
[6] sworn to tell the truth. Do you understand
[7] that?
[8]     THE DEFENDANT: Yes
[9]     THE COURT: Did you have time to meet
[10] with your family members?
[11]     THE DEFENDANT: Yes, I did.
[12]     THE COURT: Was that helpful?
[13]     THE DEFENDANT: Yes
[14]     THE COURT: What is it that you wish to
[15] do, sir?
[16]     THE DEFENDANT: To take the deal
[17]     THE COURT: Okay
[18]     Miss Selber didn't sign this, at least
[19] my copy
[20]     MR. SAX: The Memorandum of Agreement?
[21]     THE COURT: Yes. There's a place for
[22] her to have signed
[23]     MR. SAX: So I will conform it with her
[24] signature. I'm authorized to do that. I'll
[25] put a little S with two lines on it and her
        Megan Soule, RMR, CRR  (215) 683-8029

Page 27

[1] signature.
[2]     MR. SANTAGUIDA: Judge, do you have
[3] more colloquy to do?
[4]     THE COURT: Am I going to do --
[5]     MR. SANTAGUIDA: Do you want to do more
[6] of a colloquy?
[7]     THE COURT: Yes.
[8]     MR. SANTAGUIDA: Okay.
[9]     THE COURT: I thought you had said it
[10] was two counts of third-degree murder, two
[11] counts of robbery and to criminal conspiracy,
[12]     MR. SANTAGUIDA: Not the robbery
[13] because he didn't know there was going to be a
[14] robbery.
[15]     MR. SAX: If Mr. Santaguida was
[16] listening, he didn't know there was going to be
[17] a murder either, but he's pleading guilty to
[18] that. And I had been saying all along it's two
[19] counts of third-degree murder, two counts of
[20] robbery and one count of conspiracy
[21]     THE COURT: But on this form you still
[22] have VUFA and PIC, so cross those out. Can you
[23] hand this down, Mr. Brechemin? Mr. Mena, if
[24] you could ask Mr. Sax to cross those off and to
[25] initial those
        Megan Soule, RMR, CRR  (215) 683-8029

Page 28

[1]     Would you rather just go to trial, Mr.
[2] Rigney?
[3]     THE DEFENDANT: No.
[4]     THE COURT: Okay. So I've been
[5] advised, Mr. Rigney, that you wish to accept
[6] the offer that the Commonwealth has made, and
[7] in this case that is to two counts of
[8] third-degree murder, two counts of robbery, and
[9] one count of criminal conspiracy. And although
[10] it doesn't explicitly say so in Paragraph 7, I
[11] think it should be added that the Commonwealth
[12] is waiving the mandatory life sentence
[13]     MR. SANTAGUIDA: I have that there
[14]     THE COURT: Oh, it is on there?
[15]     MR. SANTAGUIDA: Yeah.
[16]     THE COURT: Where is it?
[17]     MR. SANTAGUIDA: Oh, here. I'm sorry
[18]     MR. SAX: On there. If the Court wants
[19] it also on the Memorandum of Agreement, and I
[20] understand that, so I'll add that
[21]     THE COURT: Okay. If you could hand
[22] that up to me, Mr. Brechemin. Thank you
[23]     MR. SAX: What I'll state, Your Honor,
[24] is mandatory life sentences for both second and
[25] two thirds expressly waived.
        Megan Soule, RMR, CRR  (215) 683-8029

RR 29

51CR00094622011
Darryl Rigney

Page 29

[1]     THE COURT CRIER   Judge, there's no
[2]  conspiracy on the sheet
[3]     THE COURT·  Okay.  Mr Sax, it sounds
[4]  like maybe either there was an error in the
[5]  returning of the Bills of Information that were
[6]  prepared by the District Attorney's Office, or
[7]  maybe it was not held for court by the judge, I
[8]  don't know, but on our computer sheets there is
[9]  no charge of criminal conspiracy
[10]     MR. SAX.  I'm sure Mr Santaguida will
[11]  waive that, but I had it  Let me see  I'm
[12]  sure Mr. Santaguida will waive that
[13]     THE COURT   I'll see counsel for a
[14]  second
[15]     MR. SAX.  Sure.
[16]     (A discussion at sidebar was held off
[17]  the record )
[18]     THE COURT:  Is that going replace an
[19]  existing bill, or is that going to -- what are
[20]  we doing?
[21]     MR. SAX.  I would have that replace
[22]  count four
[23]     THE COURT:  The PWID?
[24]     MR. SAX   Yes.
[25]     THE COURT  So Miss Corbett Bill I

Megan Soule, RMR, CRR  (215) 683-8029

Page 30

[1]  number four is amended with the consent of
[2]  defense counsel to reflect that it's a criminal
[3]  conspiracy instead of a PWID, is that correct,
[4]  Mr Santaguida?
[5]     MR. SANTAGUIDA   Yes
[6]     THE COURT:  All right.  So ordinarily
[7]  for two charges of third-degree murder there is
[8]  a mandatory life sentence, which the District
[9]  Attorney's Office has agreed to waive in this
[10]  case  And instead for your guilty plea to
[11]  those five charges, two counts of third-degree
[12]  murder and two counts of robbery -- and why are
[13]  there two counts of robbery?  Who was robbed?
[14]     MR. SAX.  The two victims in this case
[15]  are Petrella London and Jemark, J-E-M-A-R-K,
[16]  Glen Miller Daniel
[17]     THE COURT   Okay.  And the two counts
[18]  of robbery and one count of criminal
[19]  conspiracy, in exchange for your plea to those
[20]  as well as to your testimony against the two
[21]  individuals we've discussed earlier, the
[22]  District Attorney's Office agrees to a maximum
[23]  sentence for you of not less than 19 years, no
[24]  more than 28 years in a state correctional
[25]  institution. Is that your understanding of the

Megan Soule, RMR, CRR  (215) 683-8029

Page 31

[1]  agreement that you're entering here today?
[2]     THE DEFENDANT·  Yes
[3]     THE COURT:  And if at any -- you're 35
[4]  years old, Mr. Rigney?
[5]     THE DEFENDANT:  Yes
[6]     THE COURT:  And you went as far as the
[7]  11th grade?
[8]     THE DEFENDANT·  Yes
[9]     THE COURT   What school?
[10]     THE DEFENDANT.  Strawberry Mansion
[11]  High.
[12]     THE COURT   And if you were going to
[13]  trial as to these three charges – there's five
[14]  charges, but there's three separate ones.  For
[15]  third-degree murder, the District Attorney's
[16]  Office would have to prove that an individual
[17]  was dead.  And here there are two separate
[18]  individuals who are dead  That you
[19]  participated in bringing about their deaths
[20]  and/or that they were killed by a
[21]  co-conspirator or by an accomplice of yours,
[22]  and that you had malice at the time  And
[23]  malice is a shorthand way of referring to a
[24]  particular mental state that the law regards as
[25]  being bad enough to make a killing murder. So

Megan Soule, RMR, CRR  (215) 683-8029

Page 32

[1]  it includes a hardness of heart, cruelty,
[2]  recklessness of consequences, and a mind
[3]  regardless of social duty, indicating an
[4]  unjustified disregard for the probability of
[5]  death or great bodily harm and an extreme
[6]  indifference to the value of human life.
[7]     So if anyone has so acted, they are
[8]  regarded in the eyes of the law as having acted
[9]  with malice.  Did you understand all of that?
[10]     THE DEFENDANT.  Yes.
[11]     THE COURT.  And robbery is that in the
[12]  course of committing a theft, you, or through a
[13]  co-conspirator, or through an accomplice, or
[14]  that you were an accomplice of the person,
[15]  that -- an accomplice is someone who aids
[16]  another.  Okay  It can be -- it doesn't mean
[17]  that there was an agreement.  It means that
[18]  there is an aiding of another to commit a
[19]  crime.  And so that you were an accomplice to
[20]  someone who committed a robbery  Someone can
[21]  be an accomplice to someone for any crime,
[22]  pretty much
[23]     And so that in the course of committing
[24]  a theft, an individual was placed -- first of
[25]  all, that there was either serious bodily

Megan Soule, RMR, CRR  (215) 683-8029

RR28

51CR00094622011
Darryl Rigney

Page 33

[1]    injury committed on that individual or that
[2]    that individual was placed in danger of or was
[3]    threatened with immediate serious bodily
[4]    injury   And here the injury was so serious
[5]    that the two individuals are dead   Do you
[6]    understand that?
[7]         THE DEFENDANT·  Yes
[8]         THE COURT   And for conspiracy, it
[9]    means that you agreed with another person or
[10]   persons that one or more of you would engage in
[11]   the conduct that constituted that crime, and
[12]   then in addition to an agreement, that there
[13]   was an overt act   In other words, something
[14]   you could point to, such as going and driving
[15]   the car to get to a certain location   Do you
[16]   understand that?
[17]        THE DEFENDANT·  Yes
[18]        THE COURT   And so that is what the
[19]   District Attorney's Office would have to prove
[20]   at your trial, and that is the charges to which
[21]   today you are entering pleas of guilty   Do you
[22]   understand that?
[23]        THE DEFENDANT   Yes
[24]        THE COURT:   And the robberies carry a
[25]   maximum possible penalty as set by the
           Megan Soule, RMR, CRR  (215) 683-8029

Page 34

[1]    legislature   It's the legislature here in
[2]    Pennsylvania that sets the maximum penalties,
[3]    and the legislature for first-degree robbery
[4]    and for conspiracy, each of those carry a
[5]    maximum possible penalty of 10-to-20 years
[6]    incarceration   The third degree murder carries
[7]    a maximum possible penalty of 20-to-40 years
[8]    incarceration
[9]         So for these five charges, the District
[10]   Attorney's Office has agreed that the sentence
[11]   would be not less than 19 years, no more than
[12]   38 years, with credit for time served   Do you
[13]   understand that?
[14]        THE DEFENDANT   Yes
[15]        THE COURT.   So you understand what the
[16]   district attorney would have to prove to
[17]   convict you of these charges to which you're
[18]   pleading guilty?
[19]        THE DEFENDANT.   Yes
[20]        THE COURT   And you understand the
[21]   maximum penalties for these?
[22]        THE DEFENDANT.   Yes
[23]        THE COURT;   And you understand the
[24]   offer that has been made here?
[25]        THE DEFENDANT:   Yes
           Megan Soule, RMR, CRR  (215) 683-8029

Page 35

[1]        THE COURT:   All right   Do you have any
[2]    questions for me so far?
[3]        THE DEFENDANT:   No.
[4]        THE COURT:   Do you understand, Mr.
[5]    Rigney, that under the law you are presumed
[6]    innocent?  Do you understand that concept?
[7]        THE DEFENDANT:   Yes.
[8]        THE COURT:   In other words, you are
[9]    here.  You're presumed innocent, and it's the
[10]   district attorney's job to prove your guilt
[11]   beyond a reasonable doubt.  He has to convince
[12]   the jury of your guilt beyond a reasonable
[13]   doubt.  Do you understand that?
[14]        THE DEFENDANT.   Yes.
[15]        THE COURT.   And that presumption of
[16]   innocence, if you were having a trial, that
[17]   presumption of innocence would stay with you
[18]   throughout the entire trial and unless and
[19]   until the district attorney proved your guilt
[20]   beyond a reasonable doubt   Do you understand
[21]   that?
[22]        THE DEFENDANT.   Yes.
[23]        THE COURT.   Are you under the
[24]   impression, sir, that you have to plead guilty
[25]   here?
           Megan Soule, RMR, CRR  (215) 683-8029

Page 36

[1]        THE DEFENDANT.   No.
[2]        THE COURT:   Do you understand that you
[3]    have an absolute right to have a trial?
[4]        THE DEFENDANT.   Yes
[5]        THE COURT.   And we have 60 jurors
[6]    waiting for you and Mr. Santaguida and for Mr.
[7]    Sax to begin questioning them to see who would
[8]    get picked to decide the facts of the case
[9]        THE DEFENDANT   Yes
[10]        THE COURT.   So if you wanted to have
[11]   your trial, this is the moment to say forget
[12]   it  I want to go to trial instead.  Do you
[13]   understand that?
[14]        THE DEFENDANT   Yes
[15]        THE COURT   And you have ·· do you
[16]   understand that you have an absolute right to
[17]   have a trial in this case?
[18]        THE DEFENDANT   Yes
[19]        THE COURT   And do you understand that
[20]   you have an absolute right to be tried by a
[21]   jury of your peers?
[22]        THE DEFENDANT   Yes.
[23]        THE COURT   Did you have the
[24]   opportunity to review this four-page written
[25]   guilty plea colloquy form that you signed on
           Megan Soule, RMR, CRR  (215) 683-8029

RR 31

51CR00094622011
Darryl Rigney

Page 37

[1] the bottom of Page 3?

[2]     THE DEFENDANT: Yeah  He basically

[3] explained it

[4]     THE COURT: All right  Well, what it

[5] lays out here -- and if you want to read

[6] through it, I will be happy to pass it down

[7] again if you want to review anything with Mr.

[8] Santaguida. It talks about the fact that --

[9] well, it says here no promises or threats, but

[10] there has been a promise, and the promise is as

[11] I have stated it. And then it says the plea

[12] bargain is that the D.A. will demandatorize the

[13] life sentences for second- and third-degree

[14] murder and the sentence that you would be

[15] sentenced to is 19 years  And I'm going to

[16] put -- it doesn't say it here, but I'm going to

[17] put to 38 years

[18]     And just so you know, in Pennsylvania

[19] you have to have a minimum sentence and a

[20] maximum sentence. The minimum sentence is what

[21] let's the prison know that you're eligible for

[22] parole. The maximum sentence is the most that

[23] you could end up possibly serving  And so --

[24] and the minimal sentence cannot be more than

[25] half of the maximum. So it's 19-to-38 years in

Megan Soule, RMR, CRR  (215) 683-8029

Page 38

[1] this case. Do you understand all of that?

[2]     THE DEFENDANT: Yes

[3]     THE COURT  So it discusses also your

[4] right to trial  It explains that you do not

[5] have to plead guilty, that you are presumed

[6] innocent and that the district attorney would

[7] have to prove, that you have the right to

[8] remain silent; that you're giving up many

[9] rights by pleading guilty

[10]     Then it talks about your right to a

[11] jury trial  It talks about -- it also talks

[12] about trial by judge, but the District

[13] Attorney's Office had not agreed  Both sides

[14] have an absolute right to have a jury trial in

[15] Pennsylvania, so both sides would have to agree

[16] that it be tried just in front of a judge, but

[17] you still keep your right to a jury trial  So

[18] it talks about that

[19]     It talks about certain pretrial rights,

[20] including if you were trying to seek to

[21] suppress a statement. It talks about how

[22] you're giving up all those pretrial rights  It

[23] talks about your appeal rights.

[24]     Are you on probation or parole for

[25] anything right now?

Megan Soule, RMR, CRR  (215) 683-8029

Page 39

[1]     THE DEFENDANT. No, I'm not.

[2]     THE COURT: If you were not a citizen,

[3] that you could be deported, the fact that

[4] you're satisfied with the representation you

[5] received from your attorney and what the facts

[6] of the case are and the elements of the crimes.

[7] I told you what the district attorney would

[8] have to prove. That is what is the elements of

[9] the crimes, and you'll hear the facts of the

[10] case in just a few moments

[11]     So that's pretty much what is on this

[12] form that you reviewed with Mr Santaguida; is

[13] that correct?

[14]     THE DEFENDANT: Yes.

[15]     THE COURT: Now, have any promises or

[16] representations been made to you by anyone

[17] about anything, other than what you've heard me

[18] say here in front of everyone in this courtroom

[19] today?

[20]     THE DEFENDANT: No

[21]     THE COURT: Did anybody pressure you or

[22] threaten you in any way in order to get you to

[23] plead guilty today?

[24]     THE DEFENDANT: No

[25]     THE COURT. Or at any time, did anyone

Megan Soule, RMR, CRR  (215) 683-8029

Page 40

[1] pressure you or threaten you in any way so that

[2] you would take this deal?

[3]     THE DEFENDANT  No.

[4]     THE COURT  Are you pleading guilty of

[5] your own free will?

[6]     THE DEFENDANT  Yes

[7]     THE COURT. And whose decision is it

[8] for you to plead guilty, Mr Rigney?

[9]     THE DEFENDANT  Mine

[10]     THE COURT: All right  And you

[11] understand that there's also this memorandum of

[12] agreement

[13]     Has he signed that yet?  Can you give

[14] him this?  I think there's a couple of copies

[15] to be signed.

[16]     Have you seen that Memorandum of

[17] Agreement? And that's what discusses how

[18] you're going to have to testify against the

[19] other two individuals in this case

[20]     MR. SANTAGUIDA. We signed another one

[21]     THE COURT  I can just make a copy of

[22] that last page if it is signed.

[23]     Do you have a signed copy, Mr. Sax --

[24]     MR. SAX. I do not

[25]     THE COURT: -- that the defendant

Megan Soule, RMR, CRR  (215) 683-8029

RR 30

S1CR00094622011
Darryl Rigney

Page 41

[1] executed?

[2]     MR. SAX· I do not

[3]     THE COURT  And that Mr Santaguida

[4] executed.

[5]     What this Memorandum of Agreement

[6] discusses, Mr. Rigney, is it talks about what

[7] you were charged with and that you were

[8] arrested on or about December 8th, 2010  And

[9] if I say something that you think is incorrect

[10] or that you've never heard about and you want

[11] to talk with your attorney for any reason,

[12] please stop me. I'm not in a hurry  And so if

[13] you want to clarify anything, if you want to

[14] make sure you understand exactly what you're

[15] doing, those are important things for you to

[16] do. All right?  Are you in agreement with

[17] that?

[18]     THE DEFENDANT. Yes.

[19]     THE COURT: Okay  And it talks about

[20] the fact that you have personal knowledge of

[21] the involvement of others in this case  And it

[22] talks about the fact that you have decided that

[23] it is in your best interest to enter into this

[24] agreement and to follow the terms of it. And

[25] it indicates that you agree that you will not

Megan Soule, RMR, CRR  (215) 683-8029

Page 42

[1] commit any other crimes in the future, that you

[2] will cooperate fully and truthfully with the

[3] district attorney, the Philadelphia Police

[4] Department, and any other investigative or

[5] prosecutorial department.

[6]     I already do understand from you, Mr.

[7] Rigney, that your position -- and that you're

[8] adamant about that position -- is that you did

[9] not know that the robbery and murders were

[10] going to take place, is that correct?

[11]     THE DEFENDANT  Correct

[12]     THE COURT  And that you thought that

[13] you were going there in order to get weed.

[14]     THE DEFENDANT. Yes

[15]     THE COURT· Okay  And it says here

[16] that you will provide law enforcement agents

[17] and attorneys of the District Attorney's Office

[18] with all information in your possession or that

[19] might come into your possession about your

[20] activities or the activities of the other

[21] persons that are relevant to violations of the

[22] criminal laws in the Commonwealth of

[23] Pennsylvania, including, but not limited to the

[24] crime charged in this case; that you will not

[25] protect or attempt to protect any person by

Megan Soule, RMR, CRR  (215) 683-8029

Page 43

[1] providing any false information or by

[2] withholding information, and that you will not

[3] falsely accuse anybody else  All right?

[4]     THE DEFENDANT: Yes.

[5]     THE COURT:  If I say anything that you

[6] don't understand, please ask me to explain it.

[7]     That you will testify truthfully and

[8] completely before any grand jury or at any

[9] hearing or trial in any case in which the

[10] district attorney asks you to testify.

[11]     And that's only as to this case, is

[12] that correct, Mr. Sax?

[13]     MR. SAX: That's correct

[14]     THE COURT. Okay  And that you

[15] understand that you can and will be prosecuted

[16] for perjury if you knowingly make any false

[17] material statements while you're under oath

[18] Do you understand that?

[19]     THE DEFENDANT: Yes

[20]     THE COURT: It says here that you'll

[21] make yourself reasonably available for all

[22] interviews, grand jury testimony, related

[23] hearings and trial appearances and that you

[24] will furnish documents -- it says "in her

[25] custody." I'm going to cross that out and put

Megan Soule, RMR, CRR  (215) 683-8029

Page 44

[1] "in his custody" -- or control pertinent to any

[2] criminal investigation when you're requested to

[3] do so by the district attorney.

[4]     And obviously you're not necessarily

[5] going to be making yourself that available.

[6] The district attorney, if they need you, will

[7] bring you in for an interview or for testimony.

[8]     It then sets forth here that you're

[9] pleading guilty to two counts of third-degree

[10] murder, two counts of robbery, and it says two

[11] counts of criminal conspiracy.

[12]     MR. SAX  One count.

[13]     THE COURT. I'm going to cross out two

[14] and put one.

[15]     The other charges have already been

[16] withdrawn, which was the gun charge and two --

[17] two weapons related charges  Those were

[18] already crossed out.

[19]     It talks about the fact that you

[20] understand that the guilty plea that you enter

[21] is negotiated and that the sentence of 19-to-38

[22] years will be recommended by the Commonwealth

[23] and that the mandatory life sentence for

[24] second-degree murder and for two thirds -- it

[25] doesn't say what it is  It just say mand,

Megan Soule, RMR, CRR  (215) 683-8029

RR31

51CR00094622011
Darryl Rigney

Guilty Plea Volume 1
May 20, 2013

Page 45

[1] M A-N-D, life sent for second and two thirds.
[2] It doesn't say what you're doing with that
[3]     **MR. SAX** In one of the other copies I
[4] wrote "waived." I think it's clear But I
[5] appreciate that, Your Honor
[6]     **THE COURT**: Well, since this is
[7] probably the one that's going to get copied
[8] since it's already signed, Mr. Mena, could you
[9] hand that to Mr Sax so he can put "waived?"
[10]     **MR. SAX** Absolutely, Your Honor It's
[11] in the same pen as the rest of it
[12]     **THE COURT** Okay The record will
[13] reflect what you did.
[14]     That you're waiving any right to a
[15] prompt sentencing hearing As I told you
[16] before, the trial of these other two
[17] individuals is not scheduled until September,
[18] so you'll be testifying at that time. And so
[19] usually we try to make sure that people are
[20] sentenced within 90 days, but that's obviously
[21] not going to take place until after you've
[22] testified in this case.
[23]     It says if you comply here with the
[24] terms of the agreement, the district attorney
[25] will advise the Court of the full extent,

Megan Soule, RMR, CRR (215) 683-8029

Page 46

[1] quality and nature of your cooperation, which,
[2] obviously, I already know what you're supposed
[3] to be doing, and then I'll be advised if you
[4] did, in fact, follow that
[5]     And it says here that you agree that if
[6] you participate in any criminal activity after
[7] the date of this agreement, which is today's
[8] date, or if you lie to the district attorney or
[9] the Philadelphia police or any other law
[10] enforcement agency, or if you lie in your
[11] testimony about any material matter, or if you
[12] stop cooperating, or if you violate any of the
[13] other terms that are described in this
[14] agreement, then the agreement will be null and
[15] void and you will be prosecuted to the fullest
[16] extent and any and all statements and testimony
[17] made under this agreement and any evidence
[18] that's derived from this, either directly or
[19] indirectly, can be used against you
[20]     It says here that you agree that you
[21] will not be permitted to withdraw your guilty
[22] plea, even if the district attorney determines
[23] that you have not complied with all of the
[24] terms of this agreement.
[25]     Ordinarily, after someone pleads

Megan Soule, RMR, CRR (215) 683-8029

Page 47

[1] guilty, especially if it's in advance of trial,
[2] I will allow them the opportunity to withdraw
[3] their guilty plea if they can state any fair
[4] and just reason. But you're not going to be
[5] permitted to do that unless the District
[6] Attorney's Office asks that that happens and
[7] they can say that they're not prejudiced in
[8] bringing the trial against you Because if you
[9] wanted your trial, today is the date to have
[10] your trial. The jury is waiting and we're able
[11] to move forward with that. Do you understand
[12] that?
[13]     **THE DEFENDANT** Yes.
[14]     **THE COURT** Okay. The district
[15] attorney is relying on what you're saying that
[16] you want to do here today
[17]     I don't know if there's been time for
[18] Mr Rigney to end up having complied with
[19] Paragraph 15, for example, Mr Sax, that
[20] indicates he agrees he has disclosed all of his
[21] criminal activity as required in Paragraph 3
[22] supra, et cetera So that at this time I'm not
[23] necessarily going to find that that's -- since
[24] you haven't had the opportunity to speak to him
[25] other than today in terms of his signing this

Megan Soule, RMR, CRR (215) 683-8029

Page 48

[1] agreement, I don't know that there's been the
[2] opportunity for there to be compliance for
[3] that. And I'm just stating that for the record
[4] at this time.
[5]     And that this agreement is complete and
[6] represents the entire understanding between you
[7] and the district attorney and that it cannot be
[8] changed unless signed by both you and your
[9] attorney and by the assistant district
[10] attorney.
[11]     Is there anything that I've stated from
[12] there that is a surprise to you or that you
[13] cannot follow?
[14]     **THE DEFENDANT** No
[15]     **THE COURT** Okay. Do you understand
[16] that by pleading guilty today you give up your
[17] rights to have a trial and almost all of your
[18] rights to appeal?
[19]     **THE DEFENDANT** Yes
[20]     **THE COURT**: And the reason that you
[21] have very limited rights of appeal, people are
[22] usually appealing mistakes that are made during
[23] the course of the trial If the judge makes
[24] mistakes, if the prosecutor makes mistakes,
[25] those things would then go up for the Superior

Megan Soule, RMR, CRR (215) 683-8029



51CR00094622011
Darryl Rigney

Guilty Plea Volume 1
May 20, 2013

Page 49

[1]   Court to say do we think that Mr. Rigney – or
[2]   whoever the person is -- do we think that this
[3]   person should have a new trial because the
[4]   mistake was so big?
[5]       And so those are usually the kinds of
[6]   things that get appealed, but there's not going
[7]   to be a trial here so the only things that you
[8]   can appeal is whether I had the jurisdiction to
[9]   accept your guilty plea, which I have been a
[10]  duly elected judge for the Court of Common
[11]  Pleas This crime happened in Philadelphia,
[12]  and so I do have jurisdiction or power to make
[13]  a ruling in this case.
[14]      The next thing that you could appeal is
[15]  if you got an illegal sentence, but I've
[16]  already told you what the maximum penalties are
[17]  for these And if you got sentenced to more
[18]  than is legal, as the legislature has set
[19]  forth, then you could always appeal that.
[20]      Then the last thing that you could
[21]  appeal, Mr. Rigney, is if you wanted to argue
[22]  that your sentence was – not your sentence,
[23]  but your guilty plea was not entered into
[24]  knowingly, intelligently and voluntarily. But
[25]  that's the reason we've been having this

Megan Soule, RMR, CRR (215) 683-8029

Page 50

[1]   discussion, because I want you to understand
[2]   exactly what you're doing here and that this is
[3]   your own free choice and decision Is that the
[4]   case? Is this your own free choice and
[5]   decision?
[6]       THE DEFENDANT: Yes
[7]       THE COURT I recognize that you'd
[8]   rather not be making this choice, but that's
[9]   not what we're talking about. What we're
[10]  talking about is whether you've made a knowing
[11]  choice, knowing that you're between a rock and
[12]  a hard place Is that the case?
[13]      THE DEFENDANT Yes
[14]      THE COURT Do you have any questions
[15]  for me?
[16]      THE DEFENDANT No
[17]      THE COURT Anything else anybody needs
[18]  to add or supplement to the colloquy?
[19]      MR. SANTAGUIDA· I don't think so.
[20]      MR. SAX: No, Your Honor Just the
[21]  recitation of the facts.
[22]      THE COURT. Okay. Then if you would
[23]  please go ahead and read in a brief summary of
[24]  the facts.
[25]      MR. SAX: I'm going to try to be as

Megan Soule, RMR, CRR (215) 683-8029

Page 51

[1]   brief as possible, and it will be brief.
[2]       If the Commonwealth proceeded to trial
[3]   today, we would prove the following: On
[4]   December the 8th of the year 2010, at the
[5]   location 3001 Redner Street, R-E-D-N-E-R, in a
[6]   robbery/murder, two individuals, I think both
[7]   of Jamaican descent, Petrella -- I actually
[8]   spelled it wrong the first time –
[9]   P-E-T-R-E-L-L-A, Petrella London and Jemark
[10]  Glen Miller Daniel, both in their 20s, were
[11]  shot and killed in a robbery of approximately
[12]  11 pounds of marijuana and other items of
[13]  value, including their passports.
[14]      They each were shot a dozen times
[15]  Actually, one victim was shot 13, the other 12
[16]  They were essentially executed in their bed, as
[17]  they lay there. Jemark Daniel had brought the
[18]  marijuana from New York City. And his
[19]  girlfriend, Petrella London, had come to visit
[20]  and she was executed by virtue of the fact that
[21]  she was a witness to what had happened to
[22]  Jemark Daniel.
[23]      The two shooters in this case are
[24]  Rashon James and Montez Bethea, and we would
[25]  prove that. We would prove that by all kinds

Megan Soule, RMR, CRR (215) 683-8029

Page 52

[1]   of evidence, including the fact that
[2]   immediately after this happened, the vehicle
[3]   that was used to take those two individuals to
[4]   the location and wait for them to do this job
[5]   and leave from that location, a white Cadillac
[6]   that was traded for just before this happened
[7]   for purposes of going to this location, was
[8]   seen leaving the scene, seen by its make, model
[9]   and its license plate.
[10]      Within moments, literally in the time
[11]  it takes to go from 3001 Redner Street to 1820
[12]  North Judson Street, a couple blocks away,
[13]  within moments -- and this is broad daylight
[14]  This is, I think, 2 30, 2 35 in the afternoon
[15]  The defendant, who is the driver, and the two
[16]  individuals, Rashon James and Montez Bethea,
[17]  pull into the 1800 block of North Judson
[18]  Street, a block under surveillance in an
[19]  unrelated surveillance based on complaints of
[20]  citizens of high drug activity onto this block.
[21]      After they had heard the radio call of
[22]  a report of shots fired at 3001 Redner Street
[23]  and the occupants fleeing in a white Cadillac,
[24]  they see this very same white Cadillac with
[25]  this license plate being driven by the

Megan Soule, RMR, CRR (215) 683-8029

RR35

51CR00094622011
Darryl Rigney

Page 49

[1] Court to say do we think that Mr Rigney -- or
[2] whoever the person is -- do we think that this
[3] person should have a new trial because the
[4] mistake was so big?
[5]      And so those are usually the kinds of
[6] things that get appealed, but there's not going
[7] to be a trial here so the only things that you
[8] can appeal is whether I had the jurisdiction to
[9] accept your guilty plea, which I have been a
[10] duly elected judge for the Court of Common
[11] Pleas. This crime happened in Philadelphia,
[12] and so I do have jurisdiction or power to make
[13] a ruling in this case
[14]      The next thing that you could appeal is
[15] if you got an illegal sentence, but I've
[16] already told you what the maximum penalties are
[17] for these  And if you got sentenced to more
[18] than is legal, as the legislature has set
[19] forth, then you could always appeal that
[20]      Then the last thing that you could
[21] appeal, Mr. Rigney, is if you wanted to argue
[22] that your sentence was -- not your sentence,
[23] but your guilty plea was not entered into
[24] knowingly, intelligently and voluntarily. But
[25] that's the reason we've been having this

Megan Soule, RMR, CRR  (215) 683-8029

Page 50

[1] discussion, because I want you to understand
[2] exactly what you're doing here and that this is
[3] your own free choice and decision  Is that the
[4] case?  Is this your own free choice and
[5] decision?
[6]      THE DEFENDANT  Yes.
[7]      THE COURT  I recognize that you'd
[8] rather not be making this choice, but that's
[9] not what we're talking about.  What we're
[10] talking about is whether you've made a knowing
[11] choice, knowing that you're between a rock and
[12] a hard place  Is that the case?
[13]      THE DEFENDANT  Yes.
[14]      THE COURT.  Do you have any questions
[15] for me?
[16]      THE DEFENDANT  No
[17]      THE COURT  Anything else anybody needs
[18] to add or supplement to the colloquy?
[19]      MR. SANTAGUIDA:  I don't think so
[20]      MR. SAX:  No, Your Honor  Just the
[21] recitation of the facts.
[22]      THE COURT:  Okay  Then if you would
[23] please go ahead and read in a brief summary of
[24] the facts.
[25]      MR. SAX:  I'm going to try to be as

Megan Soule, RMR, CRR  (215) 683-8029

Page 51

[1] brief as possible, and it will be brief
[2]      If the Commonwealth proceeded to trial
[3] today, we would prove the following  On
[4] December the 8th of the year 2010, at the
[5] location 3001 Redner Street, R-E-D-N-E-R, in a
[6] robbery/murder, two individuals, both
[7] of Jamaican descent, Petrella -- I actually
[8] spelled it wrong the first time --
[9] P-E-T-R-E-L-L-A, Petrella London and Jemark
[10] Glen Miller Daniel, both in their 20s, were
[11] shot and killed in a robbery of approximately
[12] 11 pounds of marijuana and other items of
[13] value, including their passports.
[14]      They each were shot a dozen times
[15] Actually, one victim was shot 13, the other 12.
[16] They were essentially executed in their bed, as
[17] they lay there. Jemark Daniel had brought the
[18] marijuana from New York City  And his
[19] girlfriend, Petrella London, had come to visit
[20] and she was executed by virtue of the fact that
[21] she was a witness to what had happened to
[22] Jemark Daniel
[23]      The two shooters in this case are
[24] Rashon James and Montez Bethea, and we would
[25] prove that. We would prove that by all kinds

Megan Soule, RMR, CRR  (215) 683-8029

Page 52

[1] of evidence, including the fact that
[2] immediately after this happened, the vehicle
[3] that was used to take those two individuals to
[4] the location and wait for them to do this job
[5] and leave from that location, a white Cadillac
[6] that was traded for just before this happened
[7] for purposes of going to this location, was
[8] seen leaving the scene, seen by its make, model
[9] and its license plate.
[10]      Within moments, literally in the time
[11] it takes to go from 3001 Redner Street to 1820
[12] North Judson Street, a couple blocks away,
[13] within moments -- and this is broad daylight
[14] This is, I think, 2:30, 2 35 in the afternoon.
[15] The defendant, who is the driver, and the two
[16] individuals, Rashon James and Montez Bethea,
[17] pull into the 1800 block of North Judson
[18] Street, a block under surveillance in an
[19] unrelated surveillance based on complaints of
[20] citizens of high drug activity onto this block
[21]      After they had heard the radio call of
[22] a report of shots fired at 3001 Redner Street
[23] and the occupants fleeing in a white Cadillac,
[24] they see this very same white Cadillac with
[25] this license plate being driven by the

Megan Soule, RMR, CRR  (215) 683-8029

RR33

51CR00094622011
Darryl Rigney

Guilty Plea Volume 1
May 20, 2013

Page 49

[1] Court to say do we think that Mr Rigney -- or
[2] whoever the person is -- do we think that this
[3] person should have a new trial because the
[4] mistake was so big?
[5]     And so those are usually the kinds of
[6] things that get appealed, but there's not going
[7] to be a trial here so the only things that you
[8] can appeal is whether I had the jurisdiction to
[9] accept your guilty plea, which I have been a
[10] duly elected judge for the Court of Common
[11] Pleas  This crime happened in Philadelphia,
[12] and so I do have jurisdiction or power to make
[13] a ruling in this case
[14]     The next thing that you could appeal is
[15] if you got an illegal sentence, but I've
[16] already told you what the maximum penalties are
[17] for these  And if you got sentenced to more
[18] than is legal, as the legislature has set
[19] forth, then you could always appeal that
[20]     Then the last thing that you could
[21] appeal, Mr Rigney. is if you wanted to argue
[22] that your sentence was -- not your sentence,
[23] but your guilty plea was not entered into
[24] knowingly, intelligently and voluntarily  But
[25] that's the reason we've been having this

Megan Soule, RMR, CRR  (215) 683-8029

Page 50

[1] discussion, because I want you to understand
[2] exactly what you're doing here and that this is
[3] your own free choice and decision  Is that the
[4] case?  Is this your own free choice and
[5] decision?
[6]     THE DEFENDANT·  Yes
[7]     THE COURT  I recognize that you'd
[8] rather not be making this choice. but that's
[9] not what we're talking about  What we're
[10] talking about is whether you've made a knowing
[11] choice, knowing that you're between a rock and
[12] a hard place.  Is that the case?
[13]     THE DEFENDANT  Yes
[14]     THE COURT. Do you have any questions
[15] for me?
[16]     THE DEFENDANT  No
[17]     THE COURT  Anything else anybody needs
[18] to add or supplement to the colloquy?
[19]     MR. SANTAGUIDA:  I don't think so
[20]     MR. SAX:  No, Your Honor  Just the
[21] recitation of the facts
[22]     THE COURT:  Okay  Then if you would
[23] please go ahead and read in a brief summary of
[24] the facts.
[25]     MR. SAX:  I'm going to try to be as

Megan Soule, RMR, CRR  (215) 683-8029

Page 51

[1] brief as possible, and it will be brief
[2]     If the Commonwealth proceeded to trial
[3] today, we would prove the following·  On
[4] December the 8th of the year 2010, at the
[5] location 3001 Redner Street, R-E-D-N-E-R, in a
[6] robbery/murder, two individuals, I think both
[7] of Jamaican descent, Petrella -- I actually
[8] spelled it wrong the first time --
[9] P-E-T-R-E-L-L-A, Petrella London and Jemark
[10] Glen Miller Daniel, both in their 20s, were
[11] shot and killed in a robbery of approximately
[12] 11 pounds of marijuana and other items of
[13] value, including their passports.
[14]     They each were shot a dozen times.
[15] Actually, one victim was shot 13, the other 12.
[16] They were essentially executed in their bed, as
[17] they lay there. Jemark Daniel had brought the
[18] marijuana from New York City  And his
[19] girlfriend, Petrella London, had come to visit
[20] and she was executed by virtue of the fact that
[21] she was a witness to what had happened to
[22] Jemark Daniel
[23]     The two shooters in this case are
[24] Rashon James and Montez Bethea, and we would
[25] prove that  We would prove that by all kinds

Megan Soule, RMR, CRR  (215) 683-8029

Page 52

[1] of evidence, including the fact that
[2] immediately after this happened, the vehicle
[3] that was used to take those two individuals to
[4] the location and wait for them to do this job
[5] and leave from that location, a white Cadillac
[6] that was traded for just before this happened
[7] for purposes of going to this location, was
[8] seen leaving the scene, seen by its make, model
[9] and its license plate.
[10]     Within moments, literally in the time
[11] it takes to go from 3001 Redner Street to 1820
[12] North Judson Street, a couple blocks away.
[13] within moments -- and this is broad daylight.
[14] This is, I think, 2:30, 2:35 in the afternoon.
[15] The defendant, who is the driver, and the two
[16] individuals, Rashon James and Montez Bethea,
[17] pull into the 1800 block of North Judson
[18] Street, a block under surveillance in an
[19] unrelated surveillance based on complaints of
[20] citizens of high drug activity onto this block
[21]     After they had heard the radio call of
[22] a report of shots fired at 3001 Redner Street
[23] and the occupants fleeing in a white Cadillac,
[24] they see this very same white Cadillac with
[25] this license plate being driven by the

Megan Soule, RMR, CRR  (215) 683-8029

RR33

51CR00094622011
Darryl Rigney

Page 53

[1]  defendant with James and Bethea in the car
[2]     One of those two, James or Bethea,
[3]  actually take a bag out of a giant -- a large
[4]  trash bag out of the car, although someone
[5]  inside of 1820 North Judson Street, according
[6]  to the discovery and from the testimony, would
[7]  indicate that Mr. Rigney actually took a bag
[8]  into the house, a question of fact
[9]     And based on all the information, the
[10]  circumstance, the hot pursuit, everything else,
[11]  to make a long story short, at that point all
[12]  proceeds from the robbery, all of the weed,
[13]  passports for the victim, passports and other
[14]  identifying information of the victim, U.S.
[15]  currency and three weapons -- not two, three --
[16]  the two murder weapons, which were both
[17]  semi-automatic pistols, and a third weapon, a
[18]  .357 revolver, were recovered either inside
[19]  1820 North Judson or from individuals who had
[20]  immediately gone to the property 1820 North
[21]  Judson and left with some of the proceeds, but
[22]  stopped within a block, based on all the
[23]  observations.
[24]     And from -- so the last two most
[25]  important parts would be the defendant's own

Megan Soule, RMR, CRR  (215) 683-8029

Page 54

[1]  statement. What he says is this  We would
[2]  present the testimony of detective Mikah
[3]  Spotwood, in court now --
[4]     THE COURT  So he gave the statement
[5]  I'm going to cover that in a few moments. What
[6]  else?
[7]     MR. SAX  And also the testimony of an
[8]  individual who was a cellmate of the defendant
[9]  who, in essence, admitted to everything that
[10]  the defendant admitted to in addition to
[11]  knowing about what was going to happen ahead of
[12]  time  Not with respect to the murder, but with
[13]  respect to the robbery
[14]     We understand the defendant's position
[15]  on that, but I think for purposes of this
[16]  guilty plea and my recitation of the facts,
[17]  it's important to note that we would call that
[18]  person to the witness stand and he would
[19]  testify, if he testified consistent with his
[20]  statement recently taken, that the defendant
[21]  made these admissions relative to what the plan
[22]  was relative to robbery when this happened.
[23]     That, in essence, would be the
[24]  Commonwealth's case.
[25]     THE COURT:  And is that the statement

Megan Soule, RMR, CRR  (215) 683-8029

Page 55

[1]  that you turned over today?
[2]     MR. SAX:  It is and it was taken
[3]  Saturday. I'm sorry  It was taken Friday.
[4]  And as soon as Detective Spotwood told me of
[5]  its existence -- I think Thursday night -- I
[6]  had him fax it on Friday morning to Mr.
[7]  Santaguida.
[8]     MR. SANTAGUIDA:  I didn't get it.
[9]     THE COURT·  You didn't get it?
[10]     MR. SANTAGUIDA:  I wasn't in Friday. I
[11]  went to the prison.
[12]     THE COURT  Okay. So the statement
[13]  that I have that you said earlier that you had
[14]  given to the detective; is that correct?
[15]     THE DEFENDANT:  Yes
[16]     THE COURT  I'm going read it. If
[17]  there's anything that's incorrect --
[18]     MR. SANTAGUIDA:  That's in front of
[19]  him, Judge.
[20]     THE COURT:  All right  If you want to
[21]  pick it up and read along with me
[22]     THE DEFENDANT  Yes.
[23]     THE COURT:  You were asked if you could
[24]  read, write and understand the English
[25]  language, and you said yes. It might not be

Megan Soule, RMR, CRR  (215) 683-8029

Page 56

[1]  the first two pages.  It might be the third
[2]  page, it's got a box at the top and it has
[3]  your name on it.
[4]     THE DEFENDANT:  Yes
[5]     THE COURT:  At the top right-hand
[6]  corner it says Spotwood, slash, Hesser  Do you
[7]  see where I am?
[8]     THE DEFENDANT.  Yes.
[9]     THE COURT:  All right  It asks -- you
[10]  said you went as far as the 11th grade
[11]     THE DEFENDANT·  Yes.
[12]     THE COURT:  You were asked if you were
[13]  under the influence of drugs or alcohol at that
[14]  time, and you said no.  You were asked if you
[15]  understood your constitutional rights as they
[16]  had been explained to you by the two
[17]  detectives, and you said you did understand
[18]  them
[19]     THE DEFENDANT.  Yes.
[20]     THE COURT  You were asked if you had
[21]  any questions about your rights, and you said
[22]  no  You were asked if you were known by any
[23]  other names or nicknames and you said Yodel; is
[24]  that correct?
[25]     THE DEFENDANT  Yodel

Megan Soule, RMR, CRR  (215) 683-8029

RR 34

51CR00094622011
Darryl Rigney

Guilty Plea Volume 1
May 20, 2013

Page 57

[1]     THE COURT. You said you did understand
[2] that you were under arrest at that time   They
[3] told you, "We are investigating the shooting
[4] death of two individuals, Petrella London and
[5] Jemark Daniel, which occurred on Wednesday,
[6] December 8th, 2010, inside 3001 West Redner
[7] Street." Do you understand this?
[8]     THE DEFENDANT   Yes
[9]     THE COURT   And you said yes   They
[10] asked if you were present when they were
[11] killed, and you said, No, I was outside a block
[12] away, sitting in white Cadillac waiting for
[13] Montez for Rashon. Is that what you said?
[14]     THE DEFENDANT·  Yes.
[15]     THE COURT: And was that true?
[16]     THE DEFENDANT  Yes
[17]     THE COURT   You were asked, "Please go
[18] on in your own words and tell us who Montez and
[19] Rashon are and what you know about the death of
[20] the two victims."
[21]     And you can read along with me.  If
[22] there's anything that's incorrect, please let
[23] me know.
[24]     "Montez called me in the morning, about
[25] 11 something in the morning.  Montez told me he

Megan Soule, RMR, CRR  (215) 683-8029

Page 58

[1] was trying to score two ounces of marijuana
[2] He wanted me to drive because he knows I have
[3] driver's license  When he arrived, I was at
[4] the door of my mother's house.  I got in the
[5] champagne colored Marquis he pulled up in
[6] drove the car straight to Rashon's house.
[7] Rashon supposedly knew the guy that Montez was
[8] going to score off of.  While at Rashon's
[9] house, him and Montez went in Rashon's house
[10] while I waited in the car.
[11]     "About five minutes later they came out
[12] and got back in the car.  It says "sat in he
[13] back." It says "sat in he back." I guess the
[14] detective has a typo there.  "Rashon sat in the
[15] back and Montez sat in the front passenger
[16] seat. Rashon called the guy and the guy never
[17] answered.  In the meantime, the first guy
[18] called back  I heard Rashon telling the guy
[19] that his cousin wanted to buy two ounces.
[20] Rashon called the guy and told him that he
[21] needed his car, so Rashon told me to drive to
[22] 16th and Fairmount Street.
[23]     "We got to 16th and Fairmount and
[24] swapped cars, a white Caddy for the Marquis  A
[25] dark-skinned short guy was with the Caddy.

Megan Soule, RMR, CRR  (215) 683-8029

Page 59

[1] Montez and Rashon talked to the short guy and
[2] we switched cars
[3]     "The short guy took the Marquis and I
[4] drove the Caddy  Rashon moved to the front
[5] passenger seat and Montez moved to the back.
[6] Rashon called the first guy again, talked to
[7] him again, and then Rashon told me to drive to
[8] 30th and Oxford Street."
[9]     So far, have I read everything
[10] correctly?
[11]     THE DEFENDANT.  Yes.
[12]     THE COURT: So far, is that exactly
[13] what happened?
[14]     THE DEFENDANT·  Yes
[15]     THE COURT:  Is there anything
[16] different?
[17]     THE DEFENDANT.  No.
[18]     THE COURT.  How did you know it was the
[19] same first guy?
[20]     THE DEFENDANT·  Huh?
[21]     THE COURT:  How did you know it was the
[22] first guy that he called back?
[23]     THE DEFENDANT  Because he start
[24] talking about marijuana
[25]     THE COURT.  Okay

Megan Soule, RMR, CRR  (215) 683-8029

Page 60

[1]     "I drove to 30th and Jefferson and sat
[2] right there, parked on the corner  Rashon and
[3] Montez got out and walked up the block and I
[4] saw a black guy open a gate and let them in.
[5] They was in there from anywhere from three to
[6] seven minutes  When they came out of the
[7] place, Rashon had a large, dark green trash
[8] bag.  They got in the car,  Montez got in the
[9] back.  Rashon got in the front passenger seat
[10] with the bag and tossed it into the rear of the
[11] car.
[12]     "Rashon and Montez were telling me to
[13] go, go, go  Rashon was yelling it more  I
[14] realized that something wasn't right  I
[15] thought they robbed him because they went in
[16] for two ounces and came out with a trash bag.
[17] I sped off to 1820 Judson Street and went into
[18] Montez's aunt's house."
[19]     So far, did I continue reading
[20] correctly?
[21]     THE DEFENDANT.  Yes.
[22]     THE COURT.  How did you know that was
[23] Monter's aunt's house?
[24]     THE DEFENDANT  Because he said we
[25] going to my cousin's house.

Megan Soule, RMR, CRR  (215) 683-8029

RR39

51CR00094622011
Darryl Rigney

Guilty Plea Volume 1
May 20, 2013

Page 61

[1] THE COURT. Okay Had you been there
[2] before?
[3] THE DEFENDANT No, I never been to
[4] that house before.
[5] THE COURT "Rashon was carrying the
[6] trash bag in the house After entering the
[7] house, all three of us went upstairs They
[8] started dumping everything out of the bag I
[9] saw three guns, two black and one silver. I
[10] saw a large quantity of weed.
[11] "I went back downstairs. I went
[12] downstairs and sat on the chair with the girl
[13] and the baby. Then two other guys knocked on
[14] the door The girl let them in. One went
[15] upstairs and the other sat down. Rashon comes
[16] back down stairs and leaves out of the house
[17] with a duffle bag The other two guys leave
[18] out and the bigger guy, my height and size, the
[19] one who went upstairs, left out the house with
[20] a large white bag. Then Montez came downstairs
[21] with another duffle bag and sits it in the
[22] dining room and then he took a seat
[23] "Five or ten minutes later the cops
[24] came in the house and put the cuffs on
[25] everybody and restrained us."

Megan Soule, RMR, CRR (215) 683-8029

Page 62

[1] Is that what you told the detectives?
[2] THE DEFENDANT Yes
[3] THE COURT Is that what happened?
[4] THE DEFENDANT Yes
[5] THE COURT: Is there anything you want
[6] to change or add?
[7] THE DEFENDANT No
[8] THE COURT Then the statement goes on
[9] "Do you know Montez's full name?
[10] "No
[11] "Do you know Rashon's full name?
[12] "No."
[13] And I don't know if those are crossed
[14] out on your form or not, but there's one line
[15] through those two names in my form -- in my
[16] statement.
[17] "Did Montez call you from his cell
[18] phone?
[19] "Yes
[20] "What is his cell phone number?
[21] "I don't know it by heart
[22] "What is your cell phone number?" And
[23] then you gave that to them "215-284-41429."
[24] "Was that your cell phone at the time?
[25] THE DEFENDANT: Yes

Megan Soule, RMR, CRR (215) 683-8029

Page 63

[1] THE COURT: And then after that, "Were
[2] any of the calls to the guys with weed made
[3] from your phone?
[4] "ANSWER No
[5] "Do you know the name of the short
[6] dark-skinned guy with the Cadillac?
[7] "No. But I know that he is friends
[8] with Montez and Rashon
[9] "QUESTION. Did the short guy with the
[10] Cadillac, who changed into the Marquis, go to
[11] 30th and Jefferson with you, Montez and Rashon?
[12] "No He went his own way
[13] "QUESTION: Was there anybody with the
[14] boy who switched cars with you?
[15] "ANSWER. No.
[16] "QUESTION: Did you see Rashon and
[17] Montez with any guns before they went in the
[18] house at 30th and Jefferson Street?
[19] "ANSWER No.
[20] "QUESTION Have you ever been to that
[21] location near 30th Street, either alone or with
[22] Rashon or Montez?
[23] "ANSWER. No. That's the first time
[24] I've been there.
[25] "QUESTION: While they were at 30th

Megan Soule, RMR, CRR (215) 683-8029

Page 64

[1] Street, did you hear anything that sounded like
[2] gunfire?
[3] "ANSWER: No.
[4] "QUESTION· When Rashon and Montez got
[5] in the car and yelled for you to go, did they
[6] tell you what happened inside?
[7] "ANSWER. Yeah. I asked Rashon,
[8] 'What's this shit right here?' Rashon said it
[9] was tree and guns, as he threw it in the back
[10] I said, 'Wow.' Then Rashon said to me, 'Hit
[11] him up and took their shit.' Then I took the
[12] red light. Rashon told me, 'Just go We got
[13] ya.' Montez told me where to go. I asked
[14] Montez where he wanted me to go since I was
[15] taking the light. He said go to his cousin's
[16] house on 1800 Judson Street
[17] "QUESTION· Did they tell you that they
[18] robbed the guy?
[19] "ANSWER· Yeah. That's what hit him up
[20] and take their shit means. That means robbing
[21] somebody.
[22] "QUESTION What does tree mean?
[23] "Marijuana.
[24] "QUESTION. What room inside the house
[25] on Judson Street were all three of you in?

Megan Soule, RMR, CRR (215) 683-8029



Page 65

[1]      "ANSWER. The second floor, middle
[2] bedroom
[3]      "QUESTION  What conversation was
[4] taking place inside the second floor bedroom?
[5]      "ANSWER· Rashon asked Montez did he
[6] finish her, and Montez said guarantee. Then
[7] they talked about the different types of weed
[8] that was in the bag. I left the room and went
[9] downstairs.
[10]      "QUESTION:  Describe the guns you saw
[11]      "ANSWER:  Two blacks and one silver
[12] The silver gun was the revolver and the black
[13] was an automatic
[14]      "QUESTION:  Were both the automatics
[15] the same size?
[16]      "ANSWER:  One was bigger and the other
[17] was smaller.
[18]      "QUESTION:  Had you ever saw those guns
[19] before?
[20]      "ANSWER:  No "
[21]      So you're looking up  Is there a
[22] reason?
[23]      THE DEFENDANT  I don't have Page 9.
[24]      THE COURT:  You don't have it.
[25]      THE DEFENDANT:  The last one I don't

Megan Soule, RMR, CRR  (215) 683-8029

Page 66

[1]      MR. SAX  I'll get an extra copy for
[2] Mr Rigney
[3]      THE COURT  Okay  Hold on one second.
[4] We'll get you a copy
[5]      So far, is everything that I said what
[6] you told to the detective?
[7]      THE DEFENDANT·  Yes
[8]      THE COURT  Why did you go downstairs
[9] when they were -- it says that you left the
[10] room and went downstairs.  Why did you leave?
[11]      THE DEFENDANT  They started talking
[12] crazy
[13]      THE COURT:  Talking crazy?
[14]      THE DEFENDANT  Yeah.
[15]      THE COURT:  What kind of crazy?
[16]      THE DEFENDANT  Meaning like they said
[17] did he finish her  He said guaranteed.  I
[18] didn't want parts of none of that  I went
[19] downstairs
[20]      THE COURT·  Okay.  It's the one that
[21] says Page 4 at the top
[22]      MR. SAX:  Just to keep a full one,
[23] that's a full one and it has four and five on
[24] it.
[25]      THE COURT:  Okay.  If you could turn to

Megan Soule, RMR, CRR  (215) 683-8029

Page 67

[1] Page 4 of the actual statement, Mr Brechemin.
[2] It says four at the top.
[3]      THE COURT CRIER:  Yes, Your Honor.
[4]      THE COURT:  Continue, dot, dot, dot,
[5] Page 4.
[6]      See where I am?  "Were both the
[7] automatics the same size?  One was bigger and
[8] the other was smaller."
[9]      THE DEFENDANT·  Yes.
[10]      THE COURT:  "QUESTION.  Had you ever
[11] saw those guns before?
[12]      "ANSWER.  No.
[13]      "QUESTION  Did either Montez or Rashon
[14] call anybody while inside the house?
[15]      "ANSWER:  No, not while I was with them
[16] upstairs, but I don't know" -- well, somebody
[17] wrote know -- "about when I went downstairs "
[18]      Did you write that in there or who
[19] wrote that in there?  Can you see where it says
[20] in pen "know?"
[21]      THE DEFENDANT  Yeah.
[22]      THE COURT·  You wrote that?
[23]      THE DEFENDANT  Yeah
[24]      THE COURT.  "QUESTION:  Did they call
[25] anybody on the way back to the house?

Megan Soule, RMR, CRR  (215) 683-8029

Page 68

[1]      "ANSWER:  No
[2]      "QUESTION:  Did you know the two guys
[3] that came fr the house after you, Rashon and
[4] Montez?
[5]      "ANSWER·  No.
[6]      "QUESTION·  Describe Montez
[7]      "ANSWER·  Dark-skinned, about five feet
[8] eight inches, beard, low cut.
[9]      "QUESTION·  Describe Rashon.
[10]      "Tall.  About six-feet three-inches,
[11] light-skinned, facial hair and beard
[12]      "QUESTION:  How long have you known
[13] Rashon?
[14]      "ANSWER·  About ten years
[15]      "QUESTION  How long have you known
[16] Montez?
[17]      "ANSWER  All my life
[18]      "QUESTION:  Do you know Rashon's cell
[19] phone number?
[20]      ANSWER.  No, but it should be in my
[21] cell phone book.
[22]      "QUESTION:  Did you take or receive
[23] anything from the trash bag?
[24]      "ANSWER:  No.
[25]      "QUESTION.  When you went downstairs

Megan Soule, RMR, CRR  (215) 683-8029

RR 39

51CR.00094622011
Darryl Rigney

Page 69

[1]     from the second floor bedroom, why didn't you
[2]     just leave after hearing the conversation in
[3]     the bedroom?
[4]         "ANSWER  I was waiting because they
[5]     told me that they was going to look out for me
[6]     when they told me they got me
[7]         "QUESTION  What did they mean by
[8]     telling you they got you?
[9]         "ANSWER  That they was going to give
[10]    me some merchandise  That's why I stayed  I
[11]    was waiting for my part of what they said they
[12]    was giving me
[13]        "QUESTION  Is there anything else that
[14]    have we not (sic) asked you that you know about
[15]    or may assist us in this" -- it should say m
[16]    this investigation
[17]        "ANSWER  No
[18]        "QUESTION  Please read" -- it should
[19]    say this five-page statement -- "over
[20]    completely  Make any corrections or additions
[21]    as necessary  Then initial any corrections or
[22]    additions that was needed  Afterwards, sign
[23]    each page  Do you understand this?
[24]        "ANSWER  Yes "
[25]        And did you understand that?
        Megan Soule, RMR, CRR  (215) 683-8029

Page 70

[1]         THE DEFENDANT  Yes
[2]         THE COURT  And did you sign each page?
[3]         THE DEFENDANT  Yes
[4]         THE COURT  And at the end you wrote
[5]     5 30 p.m. on December the 9th?
[6]         THE DEFENDANT  Yes
[7]         THE COURT  Is there anything else that
[8]     needs to be added, Mr. Sax?  Anything else you
[9]     want to ask at this time?
[10]        MR. SAX  Your Honor, thank you very
[11]    kindly for that opportunity  Not a single
[12]    thing
[13]        THE COURT  Okay  Then could we please
[14]    arraign Mr Rigney?
[15]        THE COURT CRIER  Yes, Your Honor
[16]        Darryl Rigney, on Common Pleas Court
[17]    docket number CP-51-CR-0009462-2011, to the
[18]    charge of murder in the third degree, how do
[19]    you plead?
[20]        THE DEFENDANT  Guilty
[21]        THE COURT CRIER  To the charge of
[22]    murder in the third degree, how do you plead?
[23]        THE DEFENDANT  Guilty
[24]        THE COURT CRIER  To the charge of
[25]    robbery, how do you plead?
        Megan Soule, RMR, CRR  (215) 683-8029

Page 71

[1]         THE DEFENDANT  Guilty
[2]         THE COURT CRIER  To the charge of
[3]     robbery, how do you plead?
[4]         THE DEFENDANT  Guilty
[5]         THE COURT CRIER  To the charge of
[6]     criminal conspiracy, how do you plead?
[7]         THE DEFENDANT  Guilty
[8]         THE COURT CRIER  Your Honor, the
[9]     defendant at the bar of the court pleads guilty
[10]    to all charges; Bills of Information have been
[11]    signed
[12]        THE COURT ████████████████ finds
[13]    ████████████████████████████████
[14]    ███████████████████████████████
[15]    thereafter ████ accept it
[16]    ████████████████ I guess you will be
[17]    waiting to be questioned in other detail by Mr.
[18]    Sax and/or the ████████ regarding your
[19]    testimony that ███████████████████
[20]    ████████████████████████████████
[21]    ████████████████████████████████
[22]    ████████████████████████████████
[23]        THE DEFENDANT  Yes
[24]        THE COURT  As you know, or as I've
[25]    told y██████████████████████████
        Megan Soule, RMR, CRR  (215) 683-8029

Page 72

[1]     ████████████████████████████████
[2]     ████████████████████████████████
[3]     ████████████████████████████████
[4]         THE DEFENDANT  Yes.
[5]         THE COURT  Do you have any questions
[6]     for me at this time?
[7]         THE DEFENDANT  No
[8]         THE COURT  I'm not going to give you a
[9]     copy of this Memorandum of Agreement -- I'm
[10]    sure that you would rather not have it with you
[11]    in the prison  Am I correct or incorrect?
[12]        THE DEFENDANT  Correct.
[13]        THE COURT  Are you presently in the
[14]    prison with either of these two individuals
[15]    against whom you would be testifying?
[16]        THE DEFENDANT  No
[17]        THE COURT  If there should be any
[18]    issue with any threats to your safety, you
[19]    should either call your attorney and let him
[20]    know that immediately or call and let Mr Sax
[21]    know  And I don't know that you have his phone
[22]    number
[23]        MR. SAX  He will right now
[24]        THE COURT  Or that you would want his
[25]    card, but I would say to call Mr Santaguida
        Megan Soule, RMR, CRR  (215) 683-8029

RR30

51CR00094622011
Darryl Rigney

Page 73

[1] right away and he will contact Mr Sax  And
[2] you could also call my chambers if you wanted
[3] to and let us know if there are any threats or
[4] any other such things that occur based on your
[5] agreement here. Do you understand that?
[6]         THE DEFENDANT·  Yes
[7]         MR. SAX.  Your Honor --
[8]         THE COURT.  Do you have any questions
[9] at all?
[10]         THE DEFENDANT  No, I don't
[11]         MR. SAX:  In the regard of Mr. Rigney's
[12] safety, so I have as big of a manilla envelope
[13] as I could find and with thick Magic Marker
[14] indicated Mr Rigney's photo number, or PID
[15] number I guess they call them now, to be
[16] separated from both Mr Bethea, and his PID
[17] number, and Mr. James, and his PID number, that
[18] they should remain separate at all times
[19]         THE COURT.  Okay  And if there's any
[20] other individuals that those two people know.
[21] And what about the person who -- is there -- ~
[22] anybody else that you have any concerns about?
[23]         THE DEFENDANT.  No.
[24]         THE COURT:  If you do, you should let
[25] Mr. Santaguida know.

Megan Soule, RMR, CRR  (215) 683-2029

Page 74

[1]         MR SANTAGUIDA  What happened, I guess
[2] when Bethea and the other guy got their
[3] discovery, they got the statement  They passed
[4] that statement around the prison, which is how
[5] that clown probably knows some of the facts of
[6] the case. But, you know, he'll deal with it
[7] He's a big guy.
[8]         THE COURT.  Well, if there's anybody at
[9] all that is saying anything to you that you
[10] feel that your safety is possibly at issue,
[11] call and let Mr Santaguida know and
[12] appropriate measures will be taken to the
[13] extent possible.
[14]         THE DEFENDANT·  Okay
[15]         THE COURT.  Okay
[16]         MR. SANTAGUIDA.  Thank you, Judge.
[17]         THE COURT·  Thank you.
[18]         MR. SAX:  CFN?
[19]         THE COURT:  I guess that you -- are you
[20] going to have Miss Selber sign this?
[21]         MR. SAX:  I will and I'll bring it back
[22] here.  Also, can I have a copy of the most
[23] fully edited and amended that I think you're
[24] holding?
[25]         THE COURT:  Yes.  I'm going to give
Megan Soule, RMR, CRR  (215) 683-2029

Page 75

[1] this to you.
[2]         MR. SANTAGUIDA.  Thank you.
[3]         THE COURT:  Do you have a second, Mr.
[4] Santaguida?
[5]         MR. SANTAGUIDA  I do.
[6]         THE COURT:  Mr Brechemin, can you give
[7] this to Mr Sax, please?  That's the one that's
[8] the most up to date, and if you would make
[9] copies of that after Miss Selber signs it. And
[10] I'd like that today, Mr. Sax.
[11]         MR. SAX:  It will be here today
[12]         (Hearing concluded at this time.)
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Megan Soule, RMR, CRR  (215) 683-8029

Page 76

CERTIFICATE

[4]         I hereby certify that the proceedings
[5] and evidence are contained fully and accurately
[6] in the notes taken by me on the trial of the
[7] above cause, and that this copy is a correct
[8] transcript of the same.


Megan M. Soule, RMR, CRR

[13]  The foregoing certification of this transcript
[14] does not apply to any reproduction of the same by
[15] any means unless under the direct control and/or
[16] direction of the certifying court reporter


Megan Soule, RMR, CRR  (215) 683-8029
Court Reporting System ;Generated 2013/09/06 18 19:31)

AFFidavit                                                    6-18-17


I did in fact arrived at 1822 godson street, after the fact,
I came to the house because rigney said she had some
marijuana.

I recieved numerous letters from daryl ligney begining in 2013
admitting that she lied to the police and in court.

I had no prior crimen falsi conviction that would of prevented
me from testifying, nor did I make any prior inconsistent statements.

Had my attorney advise me to testify, I would of testified that there
was no screen door and the door was locked and shut, when the police
kicked the door in

Also had I testified, I would of told the judge that I was not one
of the men inside the cadillac that commited or was involved in
the murders.

Actually, I was on the phone with ms rigney at the time these
murders occurred

I also would of testified that the pink bag belong to south/reese who
was there baby sitting, I also would of testified that I was unaware
POUNC 2

; the contents inside the pink bag. Before trial I informed my attorney that I would like to testify about smith touching the pink bag.

When the issue about the occasion letter came up, I told my attorney I wanted to testify because they (cops) were lying. But my attorney advise me I would not testify.

There was no way I could of been on the phone with rigney and at rodriers street shooting people at the exact same time. I also told my attorney that rigney called me in the morning of the crime

~~_____~~ The undersigned does hereby state that the facts in the attached statement are true and correct (or are true and correct to the best of my knowledge, information and belief) and that I expect to be able to prove the same at a hearing held in this matter. I understand that the statements herein are made subject to the penalties of 18 PA. C. S § 4904 (relating to unsworn falsification to authorities.

6 18 17

Mertec Bethea

| INVESTIGATION INTERVIEW RECORD | | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | | CASE NO. M10-285 | |
|---|---|---|---|---|---|
| | | | | INTERVIEWER Det Hesser | |
| **NAME** Robert Williams | | **AGE** 24 | **RACE** B/M | **DOB** 4-24-86 | |
| **ADDRESS** 4315 Pennsgrove St Phila 19104 | | **APARTMENT NO.** | | **PHONE NO** 215-847-1603 | |
| **NAME OF EMPLOYMENT/SCHOOL** Partnership for Success | | | | **SOC. SEC. NO.** 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 | |
| **ADDRESS OF EMPLOYMENT/SCHOOL** 901 E. Pleasant Ave | | **DEPARTMENT** Custodian | | **PHONE NO** 267-584-2852 | |
| **DATES OF PLANNED VACATIONS** | | | | | |
| **DATES OF PLANNED BUSINESS TRIPS** | | | | | |
| **NAME OF CLOSE RELATIVE** Patricia Williams (Mother) | | | | | |
| **ADDRESS** 1515 Jessup Way | | | | **PHONE NO.** 215-426-8100 | |
| **PLACE OF INTERVIEW** Police Headquarters, Homicide Unit | | 104 | | **DATE** 12-8-10 | **TIME** 10:50PM |
| **BROUGHT IN BY** Police | | | | **DATE** 12-8-10 | **TIME** |
| **WE ARE QUESTIONING YOU CONCERNING** The shooting death of a black male and a black female inside 3001 Redner Street on 12-8-10 | | | | | |
| **WARNINGS GIVEN BY** | | | | **DATE** | **TIME** |
| **ANSWERS** (1) | (2) | (3) | (4) (5) | (6) | (7) |

### M10-285/286

Q. Mr. Williams, my name is Detective Hesser, are you known by any other names?
A. My friends call me Block.

Q. Are you under the influence of any drugs or alcohol at this time?
A. No.

Q. Do you read, write and understand the English language?
A. Yes.

Q. How far did you go in school?
A. 11th Grade

Q. Mr. Williams, are you the owner of a white 2002 Cadillac PA tag # HPG2737 VIN#1G6KD54Y42U186781?
A. Yes, but not legally. I bought the car around the beginning of November of this year from Leonard York, a friend of mine. I paid him $4500. Dollars for the car but it's still in his name. I never transferred it over to my name yet.

Q. When was the last time that you saw the car?
A. When the cops had it at Montgomery and Judson.

Q. Why did the Police have the car?
A. I didn't really know, but the cops told me that it might have something to do with a Homicide.

C 4

RR 42

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| *CONTINUATION SHEET* | POLICE DEPARTMENT |

**Robert Williams**          M10-285/286                    **Page #2**

Q. Did you park the car where the Police had it stopped?
A. No.

Q. How did the car get to that location?
A. Earlier today around 11:30 maybe 12:00PM I traded cars with a friend of mine, his name is TEZ. I let him hold my car and he let me hold his car. That was the last time I saw my car until I saw the cops with it.

Q. What kind of car did TEZ give you to use today?
A. It was a 2002 Gran Marquis, it's gold. I think he said that the car was in his aunt's name. I don't know her name but he told me that paperwork was in the glove compartment.

Q. When was the last time that you spoke to TEZ?
A. I called him around 12:30PM and told him where my paperwork was in the car. That was the last time I talked to him. When we traded cars was the last time I saw him until I got here. I saw him down here tonight.

Q. How did you know where to find the car?
A. My girlfriend, Timia Tribble, called me because she said she got a call and someone told her that I was pulled over at Judson and Montgomery. I told her that I wasn't pulled over in my car, I told her that I didn't have my car, that I traded my car for the day with TEZ. After I talked with her I called Leonard and told him what happened and that the car was pulled over and I was gonna meet him at his mom's house that I needed him to come with me to try to get the car back. I went to my girlfriend's house at 2517 N 25th Street and got the title and then I got Leonard at his mom's house and we went to Judson and Montgomery and I saw that the cops had the car.

Q. Where were you at when you got the call from your girlfriend?
A. On my way back from South Street. I got a parking ticket down there today on TEZ's car at like 4th or 5th and South Street. The time on the ticket was 1:36PM.

Q. What happened when you and Leonard got to Judson and Montgomery?
A. I went to one of the Police officers and asked to talk to him. I told him that the white Cadillac was my car and that it was in Leonard's name. He told me to wait and he talked to another cop. The other cop asked us who's car it was and we told him the same thing then he told us that we had to go to Homicide because the car is under investigation. I told the cops that I traded cars today and showed him the car we pulled up in but he said we still had to go to Homicide. They put us in the back seat and brought us here.

Q. Was anyone else with TEZ when you gave him the car?
A. No.

Q Was anyone else with TEZ when you called him?
A. Not that I know.

Q. How long have you known TEZ?
A. Like 6 months, I see him almost every day.

Q I am showing you a single color photograph of a black male, Do you know this person?
A. That's TEZ (Identifying a photograph of Montez Bethea PPN 761764)

RR43

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| --- | --- |
| *CONTINUATION SHEET* | POLICE DEPARTMENT |

**Robert Williams**        M10-285/286        **Page #3**

Q. Is this the person that you have been referring to in this statement as the person that had possession of your Cadillac?
A. Yes.

Q. Has anyone told you anything about a murder that occurred today?
A. No.

Q. Did you try to call TEZ after you found out that the car had been stopped by the Police?
A Yea, I got no answer.

Q. Did you call him from your cell phone?
A. Yea.

Q What number did you call him at?
A I called him at his cell phone, I don't know the number from the top of my head, but it's in my phone. (Witness checks his phone) I called him at 3:26PM at 215-526-1798.

Q. Did you try any of TEZ's friends?
A. No, I don't know his friends.

Q. Whose idea was it to trade cars today?
A. TEZ's, he asked me if he could hold my car and I told him OK, but I would need his because I had to do things today. He's asked me before but we never did it before. I have traded my car with other people before though.

Q. Did TEZ say why he wanted to use your car today?
A. No.

Q. Is there anything that you can add to what you have told me?
A. No.

Q. As the person who is claiming ownership of the Cadillac would you be willing to sign a consent to a search of the vehicle?
A. Yes.

Q. Please read this 3 page statement. Make any corrections or additions that are necessary and then sign the bottom of each page when this statement is complete and correct. Do you understand this?
A. Yes.

X *Robt Williams*

RR44



# Philadelphia Police Department



**EVENT#:**          270197031

**PID#:**            761764

**NAME:**            MONTEZ

                     BETHEA

**ARREST DATE:**     Jul 9 2010 8:54AM

**AGE AT ARREST:**   31

**HEIGHT:**          508

**WEIGHT:**          160

**HAIR COLOR:**      BLACK

**EYE COLOR:**       BROWN

**Phil
Arrestee DATABASE**



### FOR INVESTIGATION ONLY
### NOT FOR IDENTIFICATION
### DESTROY AFTER 90 DAYS

Printed Philadelphia PD:   12/8/2010 6:17 P.M



| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | | CASE NO. M10-285 | |
|---|---|---|---|---|
| | | | INTERVIEWER Det. Serrano #8141 | |
| NAME P/O Alvin Outlaw #7121 PR#258598 | AGE | RACE | DOB | |
| ADDRESS 22nd district | APARTMENT NO | | PHONE NO. | |
| NAME OF EMPLOYMENT/SCHOOL | | | SOC SEC NO. | |
| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | | PHONE NO | |
| DATES OF PLANNED VACATIONS | | | | |
| DATES OF PLANNED BUSINESS TRIPS | | | | |
| NAME OF CLOSE RELATIVE | | | | |
| ADDRESS | | | PHONE NO | |
| PLACE OF INTERVIEW HOMICIDE 750 Race Street | | | DATE 12-08-10 | TIME 6:45PM |
| BROUGHT IN BY self | | | DATE | TIME |
| WE ARE QUESTIONING YOU CONCERNING Double Homicide at 3001 Redner Street on 12-08-10 | | | | |
| WARNINGS GIVEN BY | | | DATE | TIME |
| ANSWERS (1) (2) (3) | (4) | (5) | (6) | (7) |

Q  Officer, what is your tour of duty and assignment for today?
A. Working 9am to 5PM as 22school beat 7 using RPC 22 T2.

Q  Did your tour take you to the area of 3001 Redner Street?
A   Yes, I was responding to a R/C Gunshots in the area of 30th and Oxford Ave. Upon my arrival there were other units on location. I observed several officers coming out of another apartment after they cleared it. At that time, I noticed a female walk up to P/O Forrest. She told P/O Forrest that police were not at the right location. She then pointed at 3001 Rednor and stated to us, "That's where the gun shot came from". I along with other officers went to this location and observed the door open. The door to the upstairs was also opened. We went in and upon checking the location, located the bodies of an unknown male and unknown female. I helped secured the scene and I left the building attempting to located the female who spoke to P/O Forrest.  I saw her go into the corner house on the 3000 Redner I knocked on the door and she did answer. I asked her if it was okay that I come in and she said yes. I asked her what exactly did she see. She then stated, I didn't say anything, it was my aunt. Then she pointed to an older lady sitting in the living room. I asked this lady what she saw, and she then became reluctant to talk to us answering questions with questions. She eventually said she heard the gunshots and saw a couple guys leaving and didn't see anything else.  We asked her if she can come to Homicide and she stated to say " I'm not saying anything else"  She started crying after I told her that there were two bodies found. But still she still refused to talk to the detectives and she went upstairs. I asked the first female if we changed out of our uniform would her aunt talk to us. She replied it might work. So I left and me and P/O Forrest put on plain clothes and returned to the home. However, now she was telling us I didn't see anything. She was obviously scared

Q  Did you identify the female that pointed out the right location?
A  No she refused to give me her name.

P14
RR46

heard gun shots

## INVESTIGATION INTERVIEW RECORD

**PHILADELPHIA POLICE DEPARTMENT**
HOMICIDE DIVISION

CASE NO. M10-255/286

INTERVIEWER Det. Spingler #966

NAME Lester Johnson Jr.

AGE ▨  RACE ▨  DOB ▨

ADDRESS ▨

APARTMENT NO.

PHONE NO. ▨

NAME OF EMPLOYMENT/SCHOOL

SOC. SEC. NO.

ADDRESS OF EMPLOYMENT/SCHOOL

DEPARTMENT

PHONE NO

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

ADDRESS

PHONE NO

PLACE OF INTERVIEW ▨

DATE 12/10/10   TIME 4:c   AM/PM

BROUGHT IN BY

DATE   TIME   AM/PM

WE ARE QUESTIONING YOU CONCERNING Double Homicide ... 3... on Radner St.

WARNINGS GIVEN BY   DATE   TIME   AM/PM

ANSWERS
(1)   (2)   (3)   (4)   (5)   (6)   (7)

Q Mr Johnson were you present inside your home on Wednesday December ... when ... shooting occurred inside 3... on Radner St?

A. Yes

Q Did you hear anything unusual that afternoon at ... 2.50 pm?

A Yeah I heard gunshots It was over nine gunshots

Q After hearing the gunshots did you happen too see anything?

COND ☐ Yes ☐ No   VIEWED BY   CHECKED BY X Lester Johnson Jr.

RR47   P10

**INVESTIGATION INTERVIEW RECORD**
*CONTINUATION SHEET*

CITY OF PHILADELPHIA
**POLICE   DEPARTMENT**

NAME  Lester Johnson

PAGE  2

CASE NO  M10-285/286

A. I happened to peep out the window and I saw a white Cadillac speed off that went north from the intersection of Redner & 30th St. I was able to see a partial license tag number of the car which I wrote down. I wrote down H P 7 - 27 but there may have been some numbers in between that. It looked like a fairly new Cadillac.

Q. Did you happen to have the paper or note that you wrote the partial tag number of the cadillac?

A. Yes (witness presents an envelope with writing of the partial tag number observed)

Q. Could you see the driver or occupants of the cadillac?

A. No

X   Lester Johnson Jr

RR48

3A